*Mother Doe, Individually and As the Mother and Natural Guardian for Jane Doe,*
*A Minor,*
*vs.*
*Richland County School District Two,*
*Sheriff of Richland County, in His Official Capacity*
*D/B/A Richland County Sheriff's Department, John E. Ewing,*
*and*
*Jamel Bradley*

Civil Action 3:18-cv-02731-CMC

Exhibit 1

Excerpts from Plaintiff's Exhibit 2 to July 30, 2019
Deposition of Chris Lindler,
Bates No. 00432-D-001 to 00432-D-016

# RICHLAND COUNTY SHERIFF'S DEPARTMENT
## INCIDENT REPORT

**AGENCY I.D.**
SCORI    400000

**CASE NUMBER** 1804016717

**NCIC** INQ □   ENTD □

| INCIDENT TYPE | COMPLETED | FORCED ENTRY | PREMISE TYPE | UNITS ENTERED | TYPE VICTIM |
|---|---|---|---|---|---|
| 1. ALL OTHER OFFENSES | ☒ YES □ NO | □ YES ☒ NO | 22 | | ☒ INDIVIDUAL □ BUSINESS □ FINANCIAL INST □ GOVERNMENT □ RELIG. ORGN. □ SOC/PUBLIC □ OTHER □ UNKNOWN □ POLICE OFFICER |
| 2. | □ YES □ NO | □ YES □ NO | | | |
| 3. | □ YES □ NO | □ YES □ NO | | | |

**INCIDENT LOCATION (SUBDIVISION, APARTMENT AND NUMBER, STREET AND NAME AND NUMBER)** 120 SPARKLEBERRY LANE

**SUBDIVISION** SPRINGVALLEY HS    **ZIP CODE** 29229    **WEAPON TYPE**

| INCIDENT DATE | 24 HR. CLOCK | TO | DATE | 24 HR. CLOCK | DISP DATE | DISPATCH DATE/TIME 24HR CLOCK | TIME ARRIVED | REPORT TIME | AREA | GRID |
|---|---|---|---|---|---|---|---|---|---|---|
| 01012018 | 0800 | | 04172018 | 1700 | 04172018 | 1300 | 1315 | 1700 | 6 | |

**COMPLAINANT'S NAME (LAST, FIRST, MIDDLE)** ████████  RELATIONSHIP TO SUBJECT AQ  RES  RACE J  SEX B  AGE F  15  ETH N  DAYTIME PHONE ████  EVENING PHONE ████

**ADDRESS**   CITY COLUMBIA  STATE SC  ZIP CODE 29223

## VICTIM NO. 1

**VICTIM'S NAME (LAST, FIRST, MIDDLE)** UNKNOWN, ASHLEY  RELATIONSHIP TO SUBJECT AQ  RES U  RACE U  SEX F  AGE 99  ETH U  DAYTIME PHONE  EVENING PHONE

| HEIGHT | WEIGHT | HAIR | EYES | FACIAL HAIR, SCARS, TATTOOS, GLASSES, CLOTHING, PHYSICAL PECULIARITIES, ETC. |
|---|---|---|---|---|

**ADDRESS** UNKNOWN    CITY UNKNOWN  STATE SC  ZIP CODE

VISIBLE INJURY (VICT. 1) □ YES ☒ NO  EXPLAIN:  COMPLAINT OF ANY NON-VISIBLE INJURIES: □ YES ☒ NO
VICTIM (NO. 1) USING ALCOHOL □ YES ☒ NO □ UNK  DRUGS □ YES ☒ NO □ UNK TYPE:
□ TWO-MAN VEH. □ ONE-MAN VEH. □ DET / SPEC. ASSNT □ OTHER □ ALONE □ ASSISTED  GANG RELATED □ NO □ YES

## SUBJECT NO. 1

☒ SUSPECT  □ RUNAWAY  □ WANTED  □ WARRANT  □ ARREST  □ JAIL  □ SUMMONS

**NAME (LAST, FIRST, MIDDLE)** UNKNOWN, UNKNOWN  RACE U  SEX M  AGE 38  ETH U  DATE OF BIRTH  HEIGHT  WEIGHT  HAIR  EYES

FACIAL HAIR, SCARS, TATOOS, GLASSES, CLOTHING, PHYSICAL PECULIARITIES, ETC.  NCIC NUMBER

**ADDRESS** UNKNOWN    CITY  STATE SC  ZIP CODE

SUBJECT (NO. 1) USING ALCOHOL □ YES ☒ NO □ UNK  ARRESTED NEAR OFFENSE SCENE □ YES ☒ NO  OFFENSE DATE  OFFENSE TIME  ARREST DATE  ARREST TIME
DRUGS □ YES ☒ NO □ UNK TYPE:  TOTAL # ARRESTED:

## NARRATIVE

BWC ON
R/O WAS DISPATCHED TO 720 GRACERN ROAD IN REFERENCE TO A CSC. UPON ARRIVAL, R/O MADE CONTACT WITH SUSAN YELVERTON WHO GAVE R/O'S A BRIEF DESCRIPTION ABOUT THE REASON FOR THE CALL AND THEN INTRODUCED R/O'S TO THE COMPLIANT, ████████. THE COMPLIANT ADVISED ME THAT SHE HAD A STORY TO TELL ME BUT THAT IT WAS ONLY A HYPOTHETICAL STORY. THE COMPLIANT REFERRED TO THE INDIVIDUAL IN THE STORY AS ASHELY AND SPOKE FROM ONLY ASHLEYS PERSPECTIVE. THE COMPLIANT STATED TO ME IN THE STORY THAT ASHELY WAS HAVING AN INAPPROPRIATE RELATIONSHIP AT HER SCHOOL. ASHLEY DID NOT GIVE A NAME OF THE OTHER INDIVIDUAL IN THE RELATIONSHIP AND REFUSED TO EVEN AFTER BEING ASKED MULTIPLE TIMES. ASHLEY STATED THINGS SUCH AS; SAID MAN TOUCHED HER BUTT, KISSED HER NECK, WENT UP HER SHIRT, KISSED HER LIPS, AND TOUCHED HER VAGINAL AREA. ALL AMOUNTING TO 4 DIFFERENT OCCASIONS ████████ TOLD ASHLEYS STORY TWICE. ONCE WITH DEPUTIES AND A COUNSELOR AND ANOTHER WITH DEPUTIES, INVESTIGATORS, AND THE COUNSELOR. EACH TIME ████ SAID ASHLEYS STORY THE SAME WAY AND REFUSED TO GIVE CERTAIN INFORMATION MAKING THE STORY CREDIBLE/RELIABLE. THE PRIMARY INVESTIGATOR ON SCENE CPT JACKSON, GAVE ████ HER NUMBER TO ENCOURAGE ████ THAT IF SHE WANTED TO FURTHER COMMUNICATE THE STORY TO HER WITH MORE RELIABLE INFORMATION SHE COULD DO SO. ████ ALSO DISCLOSED AFTER TELLING ASHLEYS STORY THAT, ████████ WHEN ████████ WAS DONE DISCUSSING HER STORY WITH LAW ENFORCEMENT SHE WAS PICKED UP BY ████████ AND LEFT THE FACILITY.

| PROPERTY | SEIZED $ | BURNED $ | DAMAGED $ |
|---|---|---|---|

## ADMINISTRATIVE

☒ ACTIVE  □ ADM. CLOSED  □ UNFOUNDED    □ ARRESTED UNDER 18  □ ARRESTED 18 AND OVER    □ EX-CLEAR UNDER 18  □ EX-CLEAR 18 AND OVER

REASON FOR EXCEPTIONAL CLEARANCE: 1 □ OFFENDER DEATH 2 □ NO PROSECUTION 3 □ EXTRADITION DENIED 4 □ VICTIM DECLINES COOPERATION 5 □ JUVENILE - NO CUSTODY

| S. NO. | REPORTING OFFICER(S) | DATE | S. NO. | APPROVING OFFICER | DATE |
|---|---|---|---|---|---|
| 1735 | Johnson, Keenan | 04172018 | | Young, Robert | 04182018 |
| 1897 | KRAMER, BRIANA | 04172018 | FOLLOW UP INVESTIGATION ☒ YES □ NO  S NO 815  OFFICER LINDLER | DATE 4-18 |

CONFIDENTIAL


PLAINTIFF'S EXHIBIT 2 Lindler
PENGAD 800-631-6989

00432-D-001

# RICHLAND COUNTY SHERIFF'S DEPARTMENT
## SUPPLEMENTARY REPORT

AGENCY I.D.
SCORI    400000

CASE NUMBER    1804016717

NCIO

☐ ORIGINAL REPORT    ☐ SUPPLEMENTAL REPORT    ☒ INVESTIGATIVE FOLLOW UP    ☐ ADDITIONAL STOLEN PROPERTY
☐ MODIFIES ORIGINAL    ☐ CASE STATUS CHANGE    ☐ ADDITIONAL RECOVERED PROPERTY

PAGE 1    OF 1    PAGES

**NARRATIVE**

UPON ARRIVAL, I MADE CONTACT WITH ████████ INTRODUCED MY SELF, AND INITIATED ████████ TO TALK ABOUT THE SITUATION. ████████ STATED THAT SHE WAS GOING TO TELL ME A HYPOTHETICAL STORY ABOUT INAPPROPRIATE THINGS THAT WERE GOING ON AT HER SCHOOL WITH A GIRL NAMED ASHLEY AND AN SRO THAT SHE WOULD NOT RECITE HIS NAME. ████████ BEGAN TELLING ASHLEYS STORY. I HAD TO REDIRECT ████████ MULTIPLE TIMES TO STAY ON TRACK AND TO UNDERSTAND ASHELYS STORY CLEARLY. ████████ STATED THAT ASHLEY HAD DEVELOPED A RELATIONSHIP WITH THE SRO THAT HAD BEEN GOING ON FOR TWO YEARS. SHE STATED THAT ASHLEYS RELATIONSHIP WITH THE SRO HAD PREVIOUSLY JUST BEEN A MUTUAL FRIEND TYPE OF RELATIONSHIP WHERE SHE INSTILLED A LOT OF TRUST IN HIM AND CONFIDED IN HIM. SHE STATED THAT ASHLEY WOULD GO TO THE SRO'S OFFICE OFTEN TO TALK ABOUT HER LIFE STRUGGLES AND HE WOULD LISTEN TO HER AND ATTEMPT TO HELP HER. SHE STATED THAT ON THE FIRST OCCASION THAT ASHLEY FELT THE RELATIONSHIP GOT OUT OF HAND WAS WHEN ASHELY WAS IN THE STAIRWELL WITH THE SRO AND HE GRABBED HER BUTT. SHE STATED THAT ASHELY DIDN'T REALLY THINK IT WAS THAT BIG OF A DEAL. THE NEXT OCCASION THAT ████████ STATED THAT ASHELY WAS VICTIMIZED TO WAS WHEN ASHLEY WENT TO THE SRO'S OFFICE WHILE SHE WAS SKIPPING CLASS. "THE SRO TOLD HER TO GO TO CLASS AND SHE TOLD HIM THAT HE WOULD HAVE TO DRAG HER OUT OF THERE IF HE WANTED HER TO LEAVE. HE TOLD HER THAT THE ONLY WAY HE WAS GOING TO PHYSICALLY TOUCH HER IS IF THE DOOR WAS SHUT. SHE SAID YOU WONT SHUT THE DOOR. THE SRO SHUT THE DOOR". ████████ STATED THAT WHEN THE SRO SHUT THE DOOR ASHLEY WAS SITTING IN A CHAIR AND HE CAME UP TO HER AND STARTED KISSING HER NECK. AFTER THAT ASHLEY MOVED TO THE TABLE AND THE SRO LAID HER DOWN AND WENT UP HER SHIRT. THEN ASHLEY WENT TO THE DESK AND THE SRO CONTINUED TO TOUCH HER. ████████ SAID THAT DURING THAT TIME ASHLEY DID NOT WANT THIS TO HAPPEN. SHE SAID ASHELY SHOWED THIS RESPONSE BY BACKING AWAY A LITTLE WHILE THE SRO WAS KISSING HER NECK AND THAT SHE GOT AROUND THE ROOM BECAUSE SHE WAS TRYING TO GET AWAY FROM HIM. ████████ STATED THAT ASHLEY EVENTUALLY LEFT THE ROOM AND THAT THE SRO DID NOT TRY AND STOP HER. ████████ DESCRIBED THE NEXT OCCASION AS THE WORST ONE. ████████ STATED THAT THE SRO KISSED ASHELY ON THE LIPS AND THAT WAS TOTALLY CROSSING THE LINE. ████████ SAID IT BEGAN BECAUSE ASHLEY WAS SKIPPING CLASS AND WENT IN THE SRO'S OFFICE TO SIT. THE SRO LEFT HER IN THERE ALONE AND SHUT THE DOOR. EVENTUALLY THE SRO CAME BACK AND BEGAN KISSING ASHLEY. ████████ SAID THAT ASHLEY WAS IN SHOCK AND COULDN'T BELIEVE IT WAS HAPPENING BECAUSE SHE KNEW THAT WAS CROSSING THE LINE. THE FOURTH OCCASION OCCURRED, ACCORDING TO ████████ WHEN ASHLEY WAS IN THE HALLWAY LEAVING SCHOOL. ████████ STATED THAT THE SRO CAME UP TO ASHLEY AND TOUCH HER VAGINAL AREA. ASHLEY WAS CONFUSED HOW NO ONE SEEN THIS HAPPEN. ████████ STATED THE LAST OCCASION WHERE NO PHYSICAL EVENTS OCCURRED WAS WHEN ASHLEY WENT TO SCHOOL ON A SATURDAY FOR COMMUNITY SERVICE AND SHE SEEN THE SRO AND HE STARED AT HER WITH SUNGLASSES ON. ████████ SAID ASHLEY FELT THREATENED, FEARFUL, AND SCARED. ████████ SAID THAT ASHLEY WENT TO TELL HER PRINCIPAL THAT THIS WAS OCCURRING AND HE WENT ABOUT IT ON HIS OWN TO TELL THE SRO. ASHLEY SAID THAT. ████████ SAID THAT ASHLEY LOST TRUST IN TELLING HER STORY AT THAT POINT. ████████ SAID THAT ASHLEY TALKED TO A FEW OTHER ADMINISTRATORS BUT SHE FELT LIKE THEY WERE JUST TRYING TO BE NOSEY AND DIDN'T ACTUALLY CARE ABOUT HER. ████████ STATED THAT ASHLEY FINALLY TALKED TO MS BAKER WHO SHOWED AFFECTION AND SYMPATHY TO ASHLEY AND THAT ASHELY FELT COMFORT BALE TELLING MS BAKER WHAT HAPPENED.

*ALL THE SHES IN THE TEXT ABOVE ARE TO BE CONSIDERED TO BE SAID FROM ASHLEY

████████ WENT HOME ON 4/16/18 AND TOLD HER STORY TO HER FAMILY. ACCORDING TO THE COUNSELOR AND THE FAMILY, ████████ STARTED OUT THE STORY AS HYPOTHETICAL AND USING ASHLEYS NAME, BUT SHE THEN ADMITTED IT WAS HER STORY. ████████ THEN WENT TO COUNSELING AND TOLD HER COUNSELOR ABOUT THE HYPOTHETICAL STORY OF ASHLEY. THE COUNSELOR DOES NOT BELIEVE THAT IT IS A HYPOTHETICAL STORY AND BELIEVES THAT THE PERSON IN THE STORY IS ACTUALLY ████████ WHEN ████████ TOLD THE STORY TO MYSELF I TOLD HER I BELIEVED THE STORY WAS ABOUT ████████ AND NOT ASHLEY. ████████ DID NOT CONFIRM NOR DENY THIS TO MYSELF, THE COUNSELOR, THE OTHER DEPUTY, OR THE INVESTIGATORS. ████████ HAD A LOT OF MOVEMENT WHILE TELLING THIS STORY SUCH AS, PLAYING WITH HER BRACLET, LOOKING AT THE GROUND, SMILING THE ENTIRE TIME, AND CHANGING HER SEAT POSITIONING OFTEN. ████████ ALSO DISCLOSED THAT SHE WAS ████████ ████████ ALSO STATED THAT IF SHE GOT THE SRO.

☒ ACTIVE    ☐ ADM CLOSED    ☐ ARRESTED UNDER 18    ☐ EX-CLEAR UNDER 18
☐ UNFOUNDED    ☐ ARRESTED 18 AND OVER    ☐ EX-CLEAR 18 AND OVER

REASON FOR EXCEPTIONAL CLEARANCE:1, ☐ OFFENDER DEATH, 2 ☐ NO PROSECUTION, 3 ☐ EXTRADITION DENIED, 4 ☐ VICTIM DECLINES COOPERATION, 5 ☐ JUVENILE NO CUSTODY

| S. NO. | REPORTING OFFICER(S) | DATE | S. NO. | APPROVING OFFICER | DATE |
|---|---|---|---|---|---|
| 1735 | Johnson, Keenan | 04172018 | | Young, Robert | 04182018 |
| 1897 | KRAMER, BRIANA | 04172018 | FOLLOW UP INVESTIGATION ☒ YES ☐ NO | S. NO. 815    OFFICER Linder | DATE 4-18 |

CONFIDENTIAL

00432-D-002

## RICHLAND COUNTY SHERIFF'S DEPARTMENT
### SUPPLEMENTARY REPORT

AGENCY I.D.
SCORI    400000

CASE NUMBER
1804016717

NCIC
☐ INO    ENTD

☐ ORIGINAL REPORT    ☐ SUPPLEMENTAL REPORT    ☒ INVESTIGATIVE FOLLOW UP
☐ MODIFIES ORIGINAL    ☐ CASE STATUS CHANGE

☐ ADDITIONAL STOLEN PROPERTY
☐ ADDITIONAL RECOVERED PROPERTY

PAGE 1    OF 1    PAGES

**NARRATIVE**

FIRED ████████████████ SHE ALSO STATED THAT HE HAD A FAMILY AND THAT DETERRED HER FROM SAYING WHO IT WAS. SHE MADE COMMENTS THAT SUGGESTED SHE DIDNT WANT US TO DO ANYTHING ABOUT THE EVENTS SHE TOLD US, BUT SHE ALSO STATED THAT IF WE DIDNT THEN WE WERENT DOING OUR JOBS.

AS OF 4/17/18 ████████ DENIED THIS STORY BEING HERS AND DID NOT DISCLOSE THE NAME OF THE SRO. MORE DETAILS ON BWC.

**ADMINISTRATIVE**

☒ ACTIVE    ☐ ADM. CLOSED    ☐ ARRESTED UNDER 18    ☐ EX-CLEAR UNDER 18
☐ UNFOUNDED    ☐ ARRESTED 18 AND OVER    ☐ EX-CLEAR 18 AND OVER

REASON FOR EXCEPTIONAL CLEARANCE: 1. ☐ OFFENDER DEATH  2. ☐ NO PROSECUTION  3. ☐ EXTRADITION DENIED  4. ☐ VICTIM DECLINES COOPERATION  5. ☐ JUVENILE - NO CUSTODY

| S. NO. | REPORTING OFFICER(S) | DATE | S. NO. | APPROVING OFFICER | DATE |
|--------|----------------------|------|--------|-------------------|------|
| 1735 | Johnson, Keenan | 04172018 | | | |
| 1897 | KRAMER, BRIANA | 04172018 | FOLLOWUP INVESTIGATION ☐ YES ☐ NO    S. NO. 815    OFFICER Linder | | 4-18 |

CONFIDENTIAL

00432-D-003

# RICHLAND COUNTY SHERIFF'S DEPARTMENT
## SUPPLEMENTARY REPORT

AGENCY I.D.
SCORI    400000

CASE NUMBER
1804016717

NCIC
INQ    ENTD

☐ ORIGINAL REPORT         ☐ SUPPLEMENTAL REPORT         ☒ INVESTIGATIVE FOLLOW UP
☐ MODIFIES ORIGINAL       ☐ CASE STATUS CHANGE

☐ ADDITIONAL STOLEN PROPERTY
☐ ADDITIONAL RECOVERED PROPERTY

PAGE 1    OF 1    PAGES

**NARRATIVE**

AS OF 4/17/18 ▮▮▮▮ DENIED THIS STORY BEING HERS AND DID NOT DISCLOSE THE NAME OF THE SRO. MORE DETAILS ON BWC.

**ADMINISTRATIVE**

☒ ACTIVE         ☐ ADM. CLOSED
☐ UNFOUNDED

☐ ARRESTED UNDER 18
☐ ARRESTED 18 AND OVER

☐ EX-CLEAR UNDER 18
☐ EX-CLEAR 18 AND OVER

REASON FOR EXCEPTIONAL CLEARANCE 1.☐ OFFENDER DEATH 2.☐ NO PROSECUTION 3.☐ EXTRADITION DENIED 4 ☐ VICTIM DECLINES COOPERATION 5.☐ JUVENILE - NO CUSTODY

| S. NO. | REPORTING OFFICER(S) | DATE | S. NO. | APPROVING OFFICER | DATE |
|---|---|---|---|---|---|
| 1735 | Johnson, Keenan | 04172018 | | Young, Robert | 04182018 |
| 1897 | KRAMER, BRIANA | 04172018 | FOLLOW UP INVESTIGATION ☒ YES ☐ NO | S. NO. 815  OFFICER Limian | DATE 4-18 |

CONFIDENTIAL

00432-D-004

## Lindler, Chris

| | |
|---|---|
| **From:** | Stacey Baker █████████████ |
| **Sent:** | Wednesday, April 25, 2018 5:39 PM |
| **To:** | Lindler, Chris |
| **Subject:** | Fwd: Stacey Baker Written Statement █████ |
| **Attachments:** | Stacey Baker Written Statement - ███████ docx |

——— Forwarded message ———
From: Stacey Baker ███████████████
Date: Mon, Apr 23, 2018 at 2:51 PM
Subject: Stacey Baker Written Statement - █████
To: █████████, Jackson, Heidi ███████████

Let me know if you have questions.

Thanks!

—

Stacey Baker
Assistant Principal, Technology and Communications
School Testing Coordinator
Textbook Coordinator
National Board Certified Teacher (Career and Technology Education)
Spring Valley High School
Columbia, SC 29229

████████████████████

—

Stacey Baker
Assistant Principal, Technology and Communications
School Testing Coordinator
Textbook Coordinator
National Board Certified Teacher (Career and Technology Education)
Spring Valley High School
Columbia, SC 29229

████████████████

1

CONFIDENTIAL

00432-D-005

3/22/18

Spoke with ███ after school. Mrs. Schiria Wilson came to me in the lobby after school to ask me to talk to ███ about some information that had come to her about a possible pregnancy. She said ███ was very reluctant to talk with her and thought she might talk with me since I am close with ███ ███ had just left me to go to the Testing and Tutoring Center to take a test. I went to see if she was there and she was in line. I pulled her out of line and took her to a small, private room in the media center to talk with her. She was upset that Mrs. Wilson had said anything to me and was upset that Mrs. Wilson and Mr. Dobyns had been talking to her and had called her mother. I told her that we were concerned and wanted to make sure she was ok. I told her that if it would make it better, I would ensure that, for this particular situation, I would be the one she talked to and that I would be the one who called her mom. She said that there was a rumor that she was pregnant. She emphatically denied this. I asked her if it was supposedly by someone in the building and she said she was not going to talk about that. I told her that if it was, she needed to talk about it, but I also told her that I am a mandatory reporter and that anything she shares with me that would fall under the types of things I have to report could not be kept secret by me. She said she understood and knew what a mandatory reporter was. I asked her if, on a scale of 1-10, with 1 being kissing and 10 being intercourse, if we were anywhere on that scale. She said there was no intercourse. I again asked her if we were anywhere on that scale and she said she could not confirm or deny (this happened a few times). I asked again if we were anywhere on my scale and she said yes, but that she would not admit to it if she was asked about it. She said maybe in a few years she would tell me everything but not now. I asked her what would have prompted any of the rumors and she said she'd had an altercation with Deputy Bradley in his office. She said she trusted him with some information (that she did not share with me) and that he'd had a conversation about her with another female student...along the lines of her not being a "nice girl" or something like that. She said she confronted him because she was angry that he'd talked to another student about her and that he'd shared some of what she'd confided in him with another student. I asked her if I were to look on the cameras, about how many times would I see her going into his office and for how long...she said it would be a few times, but that I would also see other females students going in there and if I was going to talk to her I needed to talk to them too. I told her that if there was anything I saw on the cameras that caused me concern I would talk to everyone I saw on there. She wanted to me promise to her that she would not have to talk with Mrs. Wilson or Mr. Dobyns about this again. I told her I promised and that I would personally talk with both of them so they would know to go through me with any questions for her. At that point, I asked her to sleep on it and to tell me anything she thought I needed to know. I told her I was going to be away from school until the following Tuesday so she could email me if needed and I would respond. I told her that I was going to share our conversation with Mr. Temoney and that I was going to call her mother to talk with her about our conversation. She said she understood but didn't know why because she wasn't going to admit to anything. I told her I understood that but I was still going to have those conversations. I walked her over to Testing and Tutoring so she could take her quiz.

I went back to my office and informed Mr. Temoney. Then I called her mother. I told her about the conversation and she said that she did not believe it was true. She said that she did not think ███

CONFIDENTIAL

00432-D-006

would do that with a married man. I told her that ███████ was adamant that there had not been any intercourse but that she did indicate something, at least kissing based on my scale, had taken place. I told her that ██████ was upset about so many people talking to her about it and her mom said that she felt like it would make ██████████████ worse. I told her that I was not going to be at school until Tuesday, and she told me she was going to keep ██████ home that Friday (3/23) and possible take her out of town somewhere to relax. She asked me if I had talked to Deputy Bradley about this and I told her that I had not, that someone else would be the person to do that. She also told me that she'd been able to get ██████ an appointment with her therapist. She said ██████ talks with her sister, but not with her and did not know if she'd talked with her sister about any of this.

I gave all of this information to Mr. Temoney.

4/9/18

██████ came in right at the bell on 4/9. She told me that she needed to talk with me about a hypothetical situation. She said she'd thought about it over the break (Spring Break) and wanted to tell me about it. I asked her if this was something she'd talked with ██████ about and she said she had not. I asked her if she'd talked to her mom about it and she said she had not. She did not want her mom called, I told her I could not promise that, but if she was going to be called I would let her know before that call was made. She said it'll be our fault if she ████████████████ We went into the principal's conference room and she began telling me about a hypothetical situation involving a student named Ashley. She would not refer to Deputy Bradley by name, but instead referred to him as the married one with two kids. She said that "Ashley" had made some mistakes and felt very guilty about getting someone in trouble. She said that everything she was going to say was hypothetical and that she would not admit to it if asked. I reminded her that, even being hypothetical; I would have to report anything if it fell under behavior that would require me to report it as a mandatory reporter. I also told her that, whatever she told me, I would share with Mr. Temoney. She said she understood and told me the following about "Ashley":

- She got herself into a situation in his office. They were talking and she was flirting and he moved in closer. She said she got nervous.
- She was seated with her ankles crossed and he used his foot to uncross her ankles.
- At some point he leaned over her with his left hand on the wall above her head. She felt nervous but froze. She said she felt guilty that she froze. She couldn't figure out how to get out of the situation.
- She said that at some point she ended up seated on the table in the office. She said he pushed her back, slowly, on the table. There was some touching (she was not specific, even when asked) and kissing around the neck and shoulder area. She became upset when he tried to kiss her mouth; she said she does not like kissing on the mouth. She said at some point the back of her thighs, which were on the corner of the table, began to hurt and her leg was going to sleep.
- She kept talking about how guilty she felt, how she did not want him to get fired, that she could not come back to school because ████████████████████

CONFIDENTIAL                                                                 00432-D-007

- Many times she kept reminding me this is a hypothetical story. She said in a few years she might tell me everything but not now.
- She said she can't believe she trusted him, that he knew her family and she trusted him.

I asked her if she wanted to write any of this down, and she declined. I asked her what day this took place and she said it was around the 2nd week of March and that it had been during 2nd period (I checked her attendance after our conversation and she had an unexcused absence from 2nd period on March 14th which fit within her timeline). She asked if I was going to call her mother and I told her I was going to share her story with Mr. Temoney and the decision would be made by someone other than me, but that if the decision was to call her mother, I would come personally tell her so she would know. The entire conversation lasted about an hour. I walked her to C148 to get a pass to class.

I told Mr. Temoney that I needed to talk with him and he came to his office and I told him everything she told me. He called Mr. Keith Price and Mr. Cleve Smith. I can't recall exactly who he talked to or left a message for (I think he left Mr. Price and message and talked to Mr. Smith but I cannot be sure). At that point contact was not going to be made with her mother until further decisions were made. I asked if I needed to try again to get her to write a statement and was told not at that time. I went to her class and told her that, for now, they were deciding about what to do but that her mom was not going to be called right then. I told her when they notified me that she was going to be called I would let her know. I told her to please consider sharing this with ▮▮▮▮▮▮▮▮

### 4/16/18

I received an email from Susan Yelverton from Palmetto Health with a signed release to discuss ▮▮▮▮▮'s medical information with me.

### 4/17/18



I spoke with Susan Yelverton. She indicated that ▮▮▮▮▮ had shared a hypothetical story with her and told her she'd shared part of the same story with me. She told me that the story was about "Ashley" and involved being inappropriately touched on more than one occasion by our school resource officer with two children (▮▮▮▮▮ would not give her the name). I told her that she'd shared more with her than with me, but that the information was consistent with what I'd been told. She asked me if we'd reported it and I told her that we had. She said she would also be reporting it and that she had called ▮▮▮▮▮'s mom to discuss the hypothetical story. She said ▮▮▮▮▮ was scheduled to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I gave her Captain Ewing's name and contact #.

Around 11:00 am Mr. Temoney advised me that Captain Ewing needed some information from me (name, birthdate, etc.) about ▮▮▮▮▮ so I called him and gave him the information that he needed.

Later that afternoon, ▮▮▮▮▮'s mother called me. She wanted to talk about what Ms. Yelverton shared with her about ▮▮▮▮▮'s hypothetical story. She said that she thought it was about ▮▮▮▮▮ She asked me if anyone had spoken to Deputy Bradley and I told her that I knew he'd been spoken with but that I was not sure who from Richland County had spoken with him but that it might have been Captain

Ewing. She was upset by the story ███████ told the counselor at Palmetto Health and said that she was worried about ████████. I told her that Palmetto Health mentioned that ██████ would ██████ ███████████ and she told me that ████████ would be going to ████████████ and would not be back at SV right now. I told her to please stay in touch if she needed anything from us.

CONFIDENTIAL

00432-D-009

Richland County Sheriff's Department
Criminal Investigative Division
Investigative Report

Case number:        1804016717
Offense date:        Jan – Apr 2018
Offense time:

Victim's name:        █████████████
Victim's address:

Location of offense: 120 Sparkleberry Ln
Type of offense:        Assault/ forcible fondling

04/17/18 13:15 Lt. Lindler informed me that a young lady was at 720 Gracern Rd and had made allegations that an SRO had an inappropriate relationship with her. Lt. Lindler stated that Captain Odom called him requesting an investigator to assist his deputies.

Lt. Lindler and I made contact with Deputy Kramer and Johnson at 720 Gracern Rd. Deputy Johnson briefed us on the situation while Deputy Kramer remained in the building with the victim. Deputy Johnson explained that the victim, █████████████ disclosed to her therapist, Susan, that "Ashley" was hypothetically the victim of forcible fondling by an SRO from Spring Valley HS. Susan reported the disclosure as she is a mandated reporter and she believed that the victim was actually █████████ She believed this because █████ knew too many details and would periodically slip up and say "I" while explaining the things that happened.

Lt. Lindler, Deputy Johnson and I went into Susan's office. █████████Susan and Deputy Kramer were already in the office. █████████ wanted Deputy Kramer to stay because they had developed a rapport. █████████ explained that "hypothetically" a girl named "Ashley" was at her school, which was Spring Valley High School when several incidents took place with the School Resource Officer. █████████ spoke about an incident in which the SRO was in his office with "Ashley" and while the door was shut started kissing her on her neck, laid her down on the table, pulled up her shirt and kissed up her stomach and kissed her breast. She explained that he then moved her to his desk where the fondling continued. She explained that another time he grabbed her butt near a stairwell and another instance where he swiped his hand against her vagina near the bus loop. She explained that on another instance while in his office again he kissed her on the lips, which she considered crossing the line.

█████████ explained that she told a school administrator Mr. Dobyns about the incident. She said that she used the "hypothetical Ashley situation", █████████ explained that Mr. Dobyns responded by saying "those are some wild allegations".
█████████ explained that she told Ms. Baker of Spring Valley High School. She said that Ms. Baker was very supportive and seemed to believe her. But, █████████ said that Ms. Baker couldn't really do anything because she didn't tell her that Ashley was really her. █████████ mentioned that she seemed to want to help but couldn't work with assumptions.

Submitted by:
Page 1

Richland County Sheriff's Department
Criminal Investigative Division
Investigative Report

█████ also explained that she went to █████████ recently because she was depressed. She explained that she told the staff at █████████ about the situation at SVHS to them as well. █████ also explained that she told her mother, █████ and █████████ about the incident.

After listening to █████████ explained that we couldn't really work "hypothetical" cases with "unknown" victims. I told her that I believed her and that we would document the conversation. I gave her my cell phone number and asked her to call me if she decides to tell us if the situation is truly "hypothetical" and if she wanted to tell us who "Ashley" is.

4/18/18 Approximately 10:30 am I received a call from █████████ s therapist Susan. Susan told me that she was on speaker phone with █████████ She said that █████ came in this morning to her office and told her that she in fact is Ashley. █████████ also told Susan that the situation is real not hypothetical. Susan told me that █████ wanted her to call me and tell me this because she gave me her word that she would tell me if she decided to tell anyone.
I spoke to █████████ and thanked her for telling us that she was in fact "Ashley" and that the situation really did happen.
I told them that I was going to work on getting █████████ an interview at the assessment center so that she would not have to repeat her story.
I called and spoke to Ray at the assessment center. He said that he would work on trying to get her in the same day. Nikki from the assessment center informed me that she could be interviewed at 4:00. I called Susan and asked her to check with █████████ 's mother to see if I could pick █████████ up at 3:15 or so to take her for an interview at METCAC. I received a call back from Susan that mom gave permission for me to take her for the interview and that mom would meet us there.
I picked up █████████ and took her to the assessment center where we were met by her mother.
█████████ 's interview responses were very detailed and consistent with what she explained the day before. (See interview)

4/19/18 Lt. Lindler and I interviewed Jamel Bradley at HQ. He was mirandized by Lt. Lindler and agreed to speak with us. (See Statement)
Jamel admitted that █████████ had been in his office, but denied that the door was ever closed when she was in there. Jamel denied touching █████████ Jamel admitted to leaving █████████ in his office on the date of the school walk-out which was on March 14ᵗʰ but he said that his intern was in the office with █████████ Jamel denied ever telling █████████ anything personal about himself. Jamel suggested that we interview his intern, Martha, who he brought to HQ with him.

Lt. Lindler and I interviewed Martha in the presence of Amy Lutz who serves as the social work intern coordinator. During the interview she thought that she had been at the school on the morning of the school walk-out because she was on spring break at the university that week. However, as soon as she got home she checked her planner and

Submitted by:
Page 2

Richland County Sheriff's Department
Criminal Investigative Division
Investigative Report

discovered that she did not arrive until lunch time. Martha emailed Amy Lutz to tell her that she needed to correct that information.

In Martha's interview she explained that there was a time when she knocked on Bradley's office door because she needed to get in and she thought he was in there. She explained that he came to the door and she saw ███████ in a chair crying. She explained that Bradley asked her to give them five minutes then he closed the door. Martha explained that she sat down on the floor in the hall and waited. She said after approximately five minutes the door opened and ████████ came out. Martha also explained that ████████ was often in Bradley's office. She said that a lot of the girls liked to go to Bradley's office because they thought he was cute. (see statement for other details)

Bradley agreed to take a polygraph. Before the polygraph Director Wilson asked Bradley about the discrepancies in the statements about being alone in a room with ████████ while the door was shut. Bradley admitted that he had been in his office with ████████ with the door shut. He also admitted to telling ████████ about prior allegations that had been made against him.
After the polygraph Bradley explained that he might have kissed ████████ on the head in a comforting way, but not in his office.

4/20/18 Susan and Metcac were contacted about setting up a follow-up interview for ████████ A few questions arose based on the interviews with Bradley and the intern Martha. I picked up ████████ at 2:30 and took her to the Metcac for an interview. ████████'s mother met us there.
In this interview ████████ referred to the SRO by his name "Bradley". She did remember a time when Martha knocked on the door while she was alone in the office with Bradley while the door was closed.
████████ also corrected the date of the walkout. She said that a deputy mentioned the date was the 17th, but when she looked at the date she noticed the 17th was not a Wednesday. She corrected this information without any prompt.

4/23/18 Lt. Lindler met with Bradley again and with three staff members at Spring Valley.

5/10/18 I was at a school (Child First) for the last week. I returned and had voicemails on my phone from ████████ Susan (therapist/ complainant) and ████████'s mother. Susan expressed that she was upset about SRO Bradley being back at SV in her voicemail. She said that ████████ couldn't go back to school because he is there. I called Susan first and she said that they were keeping ████████ there during the day since she wasn't comfortable going back to SV since SRO Bradley was back in the school. I agreed to meet with her and ████████ at 3:30 to answer any questions that I could.
I went to the adolescent center at 3:30 and met with Susan and ████████ I explained that I had been out at a class for the last week and while I was out the case had been closed. I explained that I didn't know the reason for closing the case. I told ████████ that I believed her, but I also explained how a lot of times in criminal cases when it is word
Submitted by:
Page 3

Richland County Sheriff's Department
Criminal Investigative Division
Investigative Report

against word that it can be difficult to prove beyond a reasonable doubt that the crime took place. ▮▮▮▮ asked me why SRO Bradley was already back at Spring Valley. She said that she heard he returned and that's why she wasn't comfortable going back there. I explained that SRO Bradley is a very unique deputy and there must have been a request to get him back into the school. She said that she didn't understand. I told her that Bradley is a role model because he was an athlete in college, he is a very likeable person, he is a black male and also serves as a role model for people with disabilities. I just explained that this makes him very unique and sought after by others. She said that she still doesn't think that it is right that he is back in the school and going to do the same thing again to someone else. The meeting ended.

5/15/18 ▮▮▮▮ s mother Ms. ▮▮▮▮ called me and told me that they had retained an attorney. She said that she gave the attorney my phone number. I told her that I would direct him to our staff attorney when he calls. She said that the attorney's name is Dan Boyles.

Dan Boyles left a message on my voicemail. I left a message on his voicemail in response directing him to our staff attorney.

Submitted by:
Page 4

CONFIDENTIAL

00432-D-013

Richland County Sheriff's Department
Criminal Investigative Division
Investigative Report

Case number: 1804016717
Offense date: 4/17/18
Offense time:

Victim's name: █████████████
Victim's address: █████

Location of offense:
Type of offense:

4/17/18-Captian Odom from the Region 4 command called and informed me that his deputies were at 720 Gracern Rd at the PH Adolescent Recovery Center with a 15 year old female that may have had an inappropriate relationship with the SRO at Spring Valley High School. He requested our assistance with his deputies.

I informed Capt. Jackson (SVU) and she met me at the location. Once there we made contact with Deputy Keenan Johnson and Dep. Kramer. Johnson would brief us on the situation and Kramer remained with the therapist and the victim. He explained that the victim was █████████ a 15 year old that attended Spring Valley High School. She had disclosed to her therapist that "Ashley" whom she referred to hypothetically, had been the victim of forcible fondling by an unnamed SRO from Spring Valley. Susan being a mandated reporter reported the disclosure to law enforcement. Susan believed that the "Ashley" being referred to was indeed our victim █████ She had so many details and would periodically slip and refer to herself when reciting the details.

Capt. Jackson and I went into the office and met with █████ Johnson and Kramer stayed as they had developed a rapport with her and she felt comfortable talking with them. She explained to us about "Ashley", stating that it was hypothetical and that the incidents took place at Spring Valley High School. She told us of an incident where "Ashley" was in the SRO's office alone and the SRO had kissed her neck. Picked her up and laid her on a table, pulling up her shirt and kissing her stomach and breasts. She would tell us of another time when the SRO grabbed 'Ashley's" bottom while she was headed up the stairwell and another where he swiped his hand across her vagina. She also explained that he kissed her on the lips one time in his office which she says crossed the line.

She explained that she told Mr. Dobyns, an administrator about it at the school using the same hypothetical story. She also told Ms. Baker, administrator as well. Out of the two she stated that Ms. Baker was supportive and believed what she was saying. She did not tell Ms. Baker that "Ashley" was anyone else or confide that "Ashley" was indeed her She would also tell us that she was ████████████████████ She disclosed this story to them as well and is documented in her medical records. She has also told he mother, █████████████ as well. Dep. Johnson and I excused ourselves from the interview as Capt. Jackson and Dep. Kramer continued to talk with

Submitted by: *Lt. C. Lindler*
Page 1

00432-D-014

Richland County Sheriff's Department
Criminal Investigative Division
Investigative Report

█████████ It was apparent she was more open with them than she was with myself or
Johnson.

4/18/18-I would contact Eric Barnes with Richland School District Two security to
inquire about possible camera footage. Barnes would tell me that footage is kept maybe 7
days at best and that there were just to many cameras in the schools to retain footage for
much longer than that.

Capt. Jackson would let me know she received a call from █████ 's therapist, Susan
and that ████ admitted that "Ashley" was indeed her. It was decided at this point that
we needed to set ████ up for a forensic interview at the METCAC. Capt. Jackson
picked her up and met her mother at METCAC. I was present for the beginning of the
interview but had to leave due to a prior appointment. Capt. Jackson would stay for the
entire interview.

4/19/18-Capt. Jackson and I would interview Jamel Bradley at HQ. Jamel is one of the
SRO's at Spring Valley and based on ████ 's interviews we knew she was referring
to him. I read Bradley his Miranda Warnings and he agreed to speak with us. Jamel
admitted that ████ had been to his office on several occasions but never with the
door shut. He denied ever touching her. He admitted to leaving her in his office the day
of the school walkout which was would have been March 14. He also stated his intern
was there then as well. Jamel also denied telling her anything personal about himself.
When he came to HQ his intern happened to ride with him. Once we finished his intern
would come in and give a statement. Bradley asked to stay for a Polygraph.

Capt. Jackson and I would interview Martha, Jamel's intern in the presence of Amy Lutz
who is the Social Work Intern Coordinator for the sheriff's department. She gave us a
detailed statement and said she knew who ████ was and that she would come by
Bradley's office. During her interview she stated that she believed she was at school the
day of the walkout but called Capt. Jackson when she got home and stated she had
checked her planner and that she did not arrive that day until lunchtime which was well
after the walkout ended. She would also tell us that there was one time she had left
Bradley's office and propped the door open so she could get back in. She has no key.
When she returned the door was closed and she knocked on the door. Bradley answered
the door and ████ was inside in tears and Bradley asked her to give them 5 minutes.
This clearly contradicted the statement Bradley gave earlier. Martha would tell us that
████ was often coming by Bradley's office. Mostly in an effort to get out of class
and small talk.

Bradley submitted to a polygraph and did tell Director Wilson during pre-test that he had
indeed been in his office alone with ████ He did this after being confronted; pretest,
with the discrepancies in the statements. He also admitted to telling ████ about the
prior allegations that had been made against him. After the polygraph, during
questioning, Bradley stated he may have kissed ████ on the head in the hallway in a
comforting manner, just not in his office.
Submitted by:
Page 2

00432-D-015

Richland County Sheriff's Department
Criminal Investigative Division
Investigative Report

I would also speak with Deputy Chief Smith and ask that our recommendation be that he not be placed back at Spring Valley in light of these allegations and that he be moved from the SRO program.

4/20/18-███████ did a follow-up interview with METCAC. She would refer to Bradley by his name in this interview. She also remembered Martha knocking on the door one day and being alone that day in the office with Bradley.

4/23/18-I met with Bradley and took another statement as to the questions raised in the follow-up interview with ██████ She had told him that she was assaulted when she met with him in his office in February. He questioned her about the assault and she never confided what type of assault it was. He stated that was the day Martha had knocked on the door and she was crying.

I also met with Ms. Baker, Mr. Dobyns and Principal Temoney at Spring Valley. Ms. Baker would tell me that she confided in her after spring break. Ms. Baker would email a detailed account of what they talked about. It was consistent with the same facts that ██████ has been telling all along. (Baker statement is in file) Coach Dobyns says his conversations with her were very vague but centered around a rumor of an SRO getting a student pregnant. I would find out that another female student had told her mom what ██████ had been telling us about and she alerted the school administration who in turn notified Capt. John Ewing, Bradley's supervisor. Ewing would refer the allegations to internal affairs around the same time as we met with ██████ for the first time.

I also asked Mr. Temoney and Dobyns if Bradley they ever had to consult with Bradley about being too friendly with students, Temoney stated they had conversations with him about not calling kids out of class and about giving them passes to be excused. Nothing was written down and all conversations with Bradley were verbal.

4/27/18-I would learn via Jerry Maldonado that DSS had shown up at Bradley's house and wanted to put his family on Safety Plan. DSS had gotten an intake explaining that Bradley had been accused inappropriately touching four girls. That was erroneous as we were investigating only the one involving ██████ Capt. Jackson and I were aware of other allegations made to internal affairs. None of those had ever been sustained. Bradley would notify the Sheriff.

I also had a conversation with DC Stan Smith and he asked if we had any other evidence to go on at this point. It was agreed that we would close the case administrativly at this point as there was not enough probable cause to pursue an arrest warrant against Bradley at this time.

4/30/18-I prepared a memo to the Sheriff stating the same as above and said memo was also forwarded to DSS.

Submitted by:
Page 3

CONFIDENTIAL