IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Mother Doe, individually and as the Mother and Natural Guardian for Jane Doe, a minor,<br><br>                        Plaintiff,<br>     vs.<br><br>Richland County School District Two, Sheriff of Richland County in his official capacity d/b/a Richland County Sheriff's Department ("RCSD"), John E. Ewing, and Jamel Bradley,<br>                      Defendants. | Civil Action No. 3:18-cv-2731-CMC<br><br><br>**Order Granting in part and Denying in part Defendant Richland County School District Two's Motion for Summary Judgment (ECF No. 135)** |

     Through this action, Mother Doe seeks recovery from Richland County School District Two, Sheriff of Richland County in his official capacity d/b/a Richland County Sheriff's Department[1], John E. Ewing, and Jamel Bradley for alleged sexual assaults upon Jane Doe, the minor daughter of Mother Doe, during Bradley's employment as a School Resource Officer at Spring Valley High School. The matter is before the court on Defendant Richland County School District Two's ("School District") motion for summary judgment. ECF No. 135. For reasons set forth below, the motion for summary judgment is granted in part and denied in part.

**STANDARD**

     Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be

---

[1] For ease of reference, this party is referred to as "the Sheriff's Department."

drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007); *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). While all justifiable inferences must be drawn in favor of the non-movant, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986), a non-moving party cannot create a genuine issue of material fact through mere speculation or the building of inference upon inference. *Sandlands C&D LLC v. County of Horry*, 737 F.3d 45, 54 (4th Cir. 2013). "To survive summary judgment, there must be evidence on which the jury could reasonably find for the nonmovant." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); see also *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 334 (4th Cir. 2011) ("The question at the summary judgment stage is not whether a jury is sure to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find.").

Rule 56(c)(1) provides as follows:

(1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or

(b) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

2

# BACKGROUND[2]

Mother Doe alleges that during her daughter Jane Doe's freshman and sophomore years at Spring Valley High School, Jane Doe was sexually assaulted by Defendant Jamel Bradley, a Richland County Sheriff's Deputy serving as a School Resource Officer ("SRO").[3]  It is alleged that the assaults occurred on five separate occasions on the high school campus, and involved unwanted kissing, sexual touching, and sexual fondling.  ECF No. 1 at 4.[4]

The Complaint alleges several causes of action against the School District: a negligence/gross negligence claim (Fourth Cause of Action); a Title IX claim  (Fifth Cause of Action); a claim for negligent hiring, supervision, and retention of Deputy Bradley (Sixth Cause of Action); a claim for breach of fiduciary duty (Seventh Cause of Action); a claim for civil conspiracy (Eighth Cause of Action); and a state law claim for loss of personal services (Ninth Cause of Action).[5]

---

[2] The facts are presented in the light most favorable to Plaintiff.  *See* Standard, *supra*.

[3] Jane Doe was 14 and 15 years old during this time period.

[4] Jane Doe ultimately reported instances in which Deputy Bradley, while in uniform, touched her buttocks, kissed her neck, went up her shirt, kissed her lips, and touched her vaginal area.  ECF No. 135-1 at 5-6.  Certain of these alleged assaults took place inside Deputy Bradley's office at the high school.  *Id.* at 6; ECF No. 1 at 4.

[5] Plaintiff has conceded and will no longer pursue the claims for breach of fiduciary duty (Seventh Cause of Action) and civil conspiracy (Eighth Cause of Action).

3

I.    _Factual Allegations_

A memorandum of agreement ("MOA") was in place at all pertinent times between the Richland County Sheriff's Department and the School District, pursuant to which the Sheriff's Department assigned a deputy designated as an SRO to schools, including Spring Valley High School.  ECF No. 111-1.  The MOA provides that SROs "will be hired and supervised by the Sheriff's Department." _Id._ at 1.  However, if any issue with the SRO "cannot be resolved" between the School District and the Sheriff's Department, "the SRO shall be reassigned and a replacement SRO named in a timely fashion." _Id._ at 10.

Jamel Bradley was hired by the Sheriff's Department as a deputy in 2007.  ECF No. 142-3 at 2 (Bradley dep. at 22).  He was assigned as an SRO, initially at Joseph Keels Elementary School and then, in 2009, at Spring Valley High School. _Id._ at 5 (Bradley dep. at 28).

a.  Deputy Bradley's Alleged Sexual Assaults of Jane Doe

Jane Doe began attending Spring Valley High School in fall 2016.  In her sophomore year, in March 2018, Deputy Bradley allegedly sexually assaulted Jane Doe in his office at Spring Valley High School, by kissing, fondling, and groping her.  ECF No. 1 at 4.  Jane Doe reported these assaults, first to an Assistant Principal and Title IX coordinator at Spring Valley, Stacey Baker, in vague terms.  Jane Doe initially met with Ms. Baker to discuss a rumor that she, Jane Doe, was pregnant with Deputy Bradley's baby.  Jane Doe denied the pregnancy rumor to Ms. Baker and separately to Principal Temoney, but indicated to Ms. Baker on March 22, 2018 "something between kissing and intercourse" had taken place with Deputy Bradley. ECF No. 148-2 (notes of Stacey Baker) ("I asked her if, on a scale from 1-10, with 1 being kissing and 10 being intercourse,

4

if we were anywhere on that scale. She said there was no intercourse…. I asked again if we were anywhere on my scale and she said yes, but that she would not admit to it if she was asked about it. She said maybe in a few years she would tell me everything but not now."). She would not provide any detail beyond denying sexual intercourse. *Id.* Ms. Baker "asked [Jane Doe] to sleep on it and to tell me anything she thought I needed to know." *Id.*

Ms. Baker informed Principal Temoney and Mother Doe of her meeting with Jane Doe. Principal Temoney informed Captain Ewing of the rumor a few days after it occurred, reporting Jane Doe "denied being pregnant and denied any involvement with Deputy Bradley that would be considered unprofessional." ECF No. 148-7 at 1 (Ewing memorandum). Captain Ewing wrote in his memorandum "Mr. Temoney stated he believes it is possible that [Jane Doe] made the rumor up herself because she is attempting to go to another school and this may assist her in getting permission to switch schools."[6] *Id.* at 1. When Ewing asked Temoney if there were any "red flags" Ewing needed to be aware of regarding Bradley, he said no. *Id.* Ewing and his direct superiors, Major Ashe and Chief James, determined no further action was needed because it was "only a rumor." *Id.* No further action or investigation was undertaken by the school at that time.

On April 9, Jane Doe again met with Ms. Baker and discussed a "hypothetical situation" about a student named "Ashley" who was kissed and fondled by an SRO in his office during the second week of March 2018. ECF No. 148-2 at 2 (notes of Stacey Baker). Ms. Baker testified

---

[6] Principal Temoney stated at deposition he did not "recall" telling Captain Ewing he thought Jane Doe made up the rumor to help with switching schools. ECF No. 135-10 at 45 (Temoney dep.).

she believed Jane Doe was "referencing herself," instead of a "hypothetical" student while relating this situation and she believed Jane Doe was talking about Deputy Bradley. ECF No. 148-4 at 18 (Baker dep. at 139). Principal Temoney testified no Title IX investigation was initiated at that time because "at no time was it stated by Jane Doe that she was the person, um, which I think is very, very important." ECF No. 135-10 at 48 (Temoney dep.). Principal Temoney again contacted Captain Ewing, and Ewing's memorandum reflects he asked Temoney if he still believed Jane Doe was making the story up, to which Temoney replied "he really can't be sure but he believes her to be making it up to switch schools." ECF No. 148-7 at 2 (Ewing memorandum). Ewing again notified Major Ashe and Chief James and again determined nothing could be done based solely on this "hypothetical story." *Id.* However, Captain Ewing also contacted Deputy Bradley and told him to stay away from Jane Doe and to activate his body-worn camera if he had contact with her. *Id.* Ewing also told Deputy Bradley to have Principal Temoney tell Jane Doe not to go by Bradley's office, and to contact the other SRO if she needed assistance. *Id.* Again, no investigation was initiated by the school.

Jane Doe was admitted to a partial hospitalization mental health treatment program at Palmetto Health Adolescent Recovery Center during this time period. On April 17, 2018, Jane Doe told Susan Yelverton, a counselor with Palmetto Health, she was "Ashley" from her hypothetical story. Ms. Yelverton notified the School District and the Sheriff's Department the same day. The complaint was referred to Internal Affairs and the Criminal Investigation Division of the Sheriff's Department.

Jane Doe was then interviewed by Richland County Sheriff's deputies and investigators Lt. Chris Lindler and Captain Heidi Jackson regarding the "Ashley" story. ECF No. 135-17 (Forensic Interview Report). The next day, Jane Doe told Captain Jackson by phone she was "Ashley" and the hypothetical situation had happened to her. Captain Jackson then arranged for a forensic interview with Dr. Allison Foster of the South Carolina Children's Advocacy Center. Over the course of two interviews, Jane Doe revealed five sexually inappropriate encounters with Deputy Bradley, who she definitively identified in the second interview. *Id.*

Deputy Bradley was polygraphed during the course of the investigation and was determined to be "purposely uncooperative" and ultimately untruthful. ECF No. 146-20 (Wilson dep.).[7] Ms. Baker was informed that there had been a polygraph examination, and that Bradley "didn't do well on it." ECF No. 148-4 at 19 (Baker dep. at 153). However, the Sheriff's Department ultimately determined there was not enough probable cause for an arrest and the criminal investigation was closed. ECF Nos. 146-21 (Lindler dep). Captain Jackson testified she believed Jane Doe's report, the investigators were not able to "disprove allegations" against Bradley, and based on what she knew about Deputy Bradley, she did not feel comfortable with him returning to Spring Valley High School and interacting with teenage girls. ECF No. 148-24 at 5-6 (Jackson dep. at 41, 44).

---

[7] Deputy Bradley was temporarily reassigned to Watkins-Nance Elementary School while the investigation was ongoing. ECF No. 135-9 at 4-6 (Bradley dep. at 69-71).

Lt. Lindler recommended Deputy Bradley be removed from the SRO program (ECF No. 146-21); however, Sheriff Lott determined Bradley was fit to continue working as an SRO. ECF No. 146-4 at 14 (Ewing dep.) ("Q: Has anybody within the department expressed to you any desire to allow him to remain as a school resource officer? A: To allow him to remain a school resource officer? Q: Yes, Sir. A: Sheriff Lott. Q: What did he tell you about it? A: There's allegations that have not been sustained, so he felt that we should continue letting him be a school resource officer."). However, after three weeks of serving as an SRO at Watkins-Nance elementary school, Bradley returned to Spring Valley in approximately the first week of May and continued as a Spring Valley SRO for the remainder of the school year. ECF No. 135-10 at 53 (Temoney dep. at 236).

Stacey Baker testified she was "surprised" Deputy Bradley returned to Spring Valley, and she "felt it was a bad decision" to put him back in the school. ECF No. 148-4 at 20-21 (Baker dep. at 155-56). However, it does not appear the School District requested Deputy Bradley not return at that time. ECF No. 135-10 at 3-4 (Temoney dep. 51-52) ("Q: Did you ever request during your meetings with Mr. Smith and Captain Ewing that Deputy Bradley not return to Spring Valley to finish the 2018 school year? A: I did not. Q: Why not? A: . . . two things: One, Jane Doe was kind of taken care of, you know, as far as classes. Two, the investigation had occurred . . . so I'm assuming all of that was taken care of.").

Jane Doe remained on homebound status for the school year, *id.* at 53, despite wanting to return to school, because Deputy Bradley was there. ECF No. 155-5 at 16 (Jane Doe dep. at 31) ("Q: Did you want to go back to school that semester? A: I wanted to, but then I didn't want to

8

because he was still there.  But had he not been there, I would've wanted to go back . . . I would have liked to go back to school.").  Mother Doe testified she spoke with Ms. Baker and asked that Deputy Bradley be removed, as she did not feel it was good for Jane Doe to return to school if he was there.  ECF No 135-19 at 26 (Mother Doe dep. at 110).  According to Mother Doe, Ms. Baker told her the School District did not have the authority to remove him.  *Id.* at 27 (Mother Doe dep. at 111).

For the 2018-2019 school year, the School District did request that Deputy Bradley not return to Spring Valley, and this request was granted by Captain Ewing.  ECF No. 135-8 at 22 (C. Smith dep. at 69)*.*  Jane Doe returned to Spring Valley in the Fall of 2018.  On December 17, 2018, the District requested Deputy Bradley not be assigned to "any Richland Two schools or extracurricular activities unless or until we advise you otherwise."  ECF No. 135-8 at 38.  This request was honored by Captain Ewing.

b.  Previous Reports of Inappropriate Relationships with Female Students

**2011 Cheerleader Incident**.  The first report of a potentially inappropriate relationship between Deputy Bradley and a female student was initiated in 2011.  A cheerleading coach at Richland Northeast High School observed Deputy Bradley "flirting" with one of her students on the cheerleading team.  ECF No. 148-11 at 2 (Internal Affairs Summary).  She reported the student and Deputy Bradley appeared to be on their cellphones.  *Id.*  When the coach confronted the student, the student said: "No offense Coach, but he is married to a white woman and no white woman can satisfy a black man the way a black woman can."  The student also reported contact

9

with Deputy Bradley "over Facebook," that they talk about how "it won't be long before she is eighteen," and that "the other officers know that he is mine." *Id.*

The Coach provided this information to Deputy Bradley's then supervisor, Captain Pellicci, who notified Internal Affairs. He was advised to investigate and "an IA case would be opened if deemed necessary." ECF No. 142-1 at 26. Two days later, Cpt. Pellicci issued a Training Initiative on Deputy Bradley "for actions that may be misinterpreted by others as something more than professional." *Id.*[8] Four days later, additional information was received and an Internal Affairs investigation was initiated, the student was interviewed and denied a sexual relationship between herself and Deputy Bradley but admitted she and Bradley communicated on Facebook. She said her statements to her Coach were a "joke." *Id.* at 33. Deputy Bradley was also interviewed and described a "generic, simple SRO-student relationship." He denied they communicated on Facebook, but acknowledged he did accept her "friend request." *Id.* at 35. The Coach provided a written statement detailing the comments made by the student to her, as well as the name of another student present when the statements were made. Despite the inconsistent statements, no further investigation was undertaken and the Internal Affairs investigation was closed as unfounded. Although the School District was made aware of the Coach's report, no Title IX investigation was opened and no record of this report was maintained.

---

[8] The Training Initiative form ordered Bradley to refrain from engaging with students on social media and from engaging in "extracurricular conversations or activities with female students." *Id.* at 29.

This investigation and Training Initiative also revealed two prior incidents of improper contact with female students. The year before the cheerleader incident, Deputy Bradley had been verbally counseled for giving female students rides home in his patrol vehicle.  ECF No. 142-1 at 29 (Training Initiative form).  In addition, he was reminded to leave dress code violations to school administrators after he told a student her dress was not too "short" or "sheer" after the student was confronted by an administrator about her clothing.  *Id.* at 2.  A parent complained about Bradley's involvement in this interaction. *Id.*

**December 2015 Target Incident.** In December 2015, Bradley was observed by narcotics officers meeting a female Spring Valley student behind a Target store at approximately 10:30 pm. ECF No. 148-15 at 2.  After receiving this account, Captain Ewing reported this incident, not to his chain of command, but directly to Sheriff Lott "based on the sensitivity of the issue and the fact very little people need to know about this (because it could hurt the investigation)." *Id.* at 5; ECF No. 148-16 at 5 (Ewing dep. at 71) (describing the "sensitivity of the issue" as "[t]he fact that an officer is going behind a building at dark with a female, if that got out around the Richland County Sheriff's Department, everyone would be talking about it.").  Captain Ewing performed a "supervisory inquiry," but did not report the incident to Internal Affairs and insisted he did not perform an "investigation." ECF No. 148-16 at 3 ("I agreed that I looked into it.  And you keep using the word 'investigation,' and I just looked into it.  Okay?").  Captain Ewing, with Spring

11

Valley Administrator April Shell[9], met with the student who acknowledged the Target meeting but said it was to seek dating advice regarding an interracial relationship.  ECF No. 148-15 at 5-6.  The student denied conversations of a sexual nature with Bradley, and expressed she did not want to get him into trouble.  *Id.* at 6.  Captain Ewing also interviewed Deputy Bradley, who said the purpose of meeting was to talk about one of the student's friends with whom she was having a disagreement.  *Id.*  After the meeting with Captain Ewing, the student requested to speak with Ms. Shell privately, and wanted to ensure Shell didn't "think less of her" because of all the questioning, as the incident was really "innocent."  ECF No. 148-13 at 7 (Shell dep. at 24).

Despite somewhat conflicting statements, Captain Ewing determined both the student and Bradley had "innocuous explanations for the meeting and expressly denied any illegal, sexual, or inappropriate activities."[10]  He issued a verbal reprimand to Bradley.  ECF No. 148-15 at 6.  The

---

[9] Ms. Shell was the Title IX coordinator for Spring Valley at that time.  ECF No. 148-13 at 4 (Shell dep. at 11).  However, she neither investigated this complaint further nor informed the District-wide Title IX coordinators of this incident.  ECF No. 148-12 at 9 (Batchelder dep. at 46); ECF No. 148-18 at 4 (Cleveland Smith dep. at 25).

[10] We now know the Target incident was not a one-time meeting between the student and Deputy Bradley: in her deposition in his matter, she admitted to a months-long sexual relationship with Deputy Bradley, starting before the Target incident and continuing until her graduation that May.  ECF No. 148 at 20-21; 148-19 at 3-4 (Target student dep. at 37-38).  Had a more fulsome investigation occurred, numerous emails between Deputy Bradley and the student in Bradley's School District email account would have been found.  The emails included an exchange of phone numbers, a picture of himself Bradley sent to the student, plans for meetings outside of school hours, and at least one request from Bradley that the student "delete…school can see this," an email she sent to him containing her phone number. ECF No. 146 at 16-17 (Plaintiff's opposition memorandum); 146-14 (emails). If phone records of Deputy Bradley's Sheriff's Department issued phone had been searched, an investigator would have discovered at least 23 phone calls

reprimand stated it was inappropriate to meet with students after school hours, not to do it again unless it was an emergency, and Deputy Bradley was to be accompanied by another deputy if he needed to meet with a female student after school hours. *Id.* The School District took no further steps to look into this allegation. *See* ECF No. 148-3 at 6, 8 (Temoney dep. at 70, 82) ("Q . . . would you have liked to have known that the allegation or the report by another sworn law enforcement officer was that he was found behind the Target at night? Would that be important to you? A: Yeah . . . I know it was being addressed and was addressed. Um, but I also, again, with that being addressed, you know, also found it to be, I guess, unfounded or looked into.").

**May 2016 Concerned Parent Report.** The next incident occurred in May 2016, when a parent reported a tip to school officials regarding an alleged sexual relationship between Bradley and an unidentified student. ECF No. 148-22 at 3. The parent reported her daughter was a friend of the student, and had photos and a recorded conversation with the student discussing her relationship with Deputy Bradley. *Id.* at 11. The parent met with Principal Temoney and Assistant Superintendent Baron Davis about this relationship, and indicated she was aware of similar reports regarding Deputy Bradley that had been "covered up" and "brushed aside." The Concerned Parent report was conveyed to Internal Affairs, and an investigation began. Defendant Bradley denied

―――――――――――――――――

between Deputy Bradley and the student as of December 4, 2015, some of which occurred between the hours of 12:00 and 1:00 am. ECF No. 416 at 16; 146-13 (phone records). Captain Ewing admitted he could have accessed these items. ECF No. 135-11 at 17-18 (Ewing dep. at 76-77). Traci Batchelder, District-wide Title IX coordinator, testified she would "expect that the school would take some efforts to gain whatever available information that's out there." ECF No. 148-12 at 13-14 (Batchelder dep. at 53-54). However, neither the emails nor the phone records were unearthed until discovery in the instant matter.

the accusations, stating he believed the Parent was "making this up to help her daughter graduate from Spring Valley because she has failed several classes and she is not set to graduate." The parent declined to speak to Internal Affairs or to identify the student to school officials until after graduation, approximately one week away. *Id.* at 13. Principal Temoney informed the Concerned Parent he "needed this information because the student is in harm's way and the situation could get worse before next Thursday," when students were scheduled to graduate. However, once graduation occurred and the Internal Affairs investigation was closed, school officials made no further attempts to reach the Concerned Parent or determine the identity of the student.[11]

### ARGUMENTS

The School District argues it is entitled to summary judgment on all claims. ECF No. 135. On the Title IX claim, it contends District personnel did not have actual notice that Jane Doe was being sexually harassed/abused by Deputy Bradley so as to impose liability under Title IX. It submits knowledge of prior sexual misconduct by Bradley did not establish a Title IX claim, and the pregnancy rumor and hypothetical situation described by Jane Doe did not provide actual notice of sexual abuse. *Id.* at 10-12. Further, the School District contends it did not respond with deliberate indifference once Jane Doe's allegations were brought to the District's attention, as

---

[11] As it turned out, the student was the girl interviewed by Ms. Shell in connection with the Target incident.

14

failure to conduct a Title IX investigation is not evidence of deliberate indifference.[12] *Id.* at 12.  It argues there was no further abuse after the School District had actual knowledge of the allegations by Jane Doe.  *Id.* at 16.  Finally, the District submits its personnel did not have authority to transfer, suspend, or fire Bradley and therefore cannot be held liable under Fourth Circuit precedent.  *Id.* at 18.

Regarding the negligence/gross negligence claim in the Fourth Cause of Action, the School District argues gross negligence is required under the South Carolina Tort Claims Act ("SCTCA"), and Plaintiff cannot meet this standard.  *Id.* at 22.  According to the School District, it exercised "at least slight care" and therefore there is no jury issue on gross negligence.  *Id.* at 27.  The District also argues it is immune from liability based on the discretionary act exclusion of the SCTCA.  *Id.* at 30.  As to the negligent hiring, supervision, and retention claim in the Sixth Cause of Action, the School District contends it is not liable because Deputy Bradley was not an employee of the District.  *Id.* at 31-33.  Finally, it argues the loss of services claim (Ninth Cause of Action) should be limited to medical expenses.  *Id.* at 35.  The School District also notes punitive damages are not available under Title IX or the SCTCA.

In her opposition memorandum, Plaintiff argues the District had actual knowledge of Bradley's sexual assaults of Jane Doe as early as March 22, 2018, yet took no action pursuant to Title IX.  ECF No. 148 at 2.  She also argues "specific knowledge of prior sexual misconduct by

---

[12] The School District also notes liability cannot attach for failure to follow Title IX administrative requirements.  *Id.* at 18.

15

Bradley with other students provides actual notice" of a need to "curtail Deputy Bradley's sexually predatory behavior." *Id.* at 8, 10. Plaintiff contends the District acted with deliberate indifference in addressing alleged sexual abuse. *Id.* at 31. She submits Jane Doe continued to be injured after reporting the abuse when Deputy Bradley was allowed to return to Spring Valley in the 2017-2018 school year. She notes District personnel had the ability to remove Bradley from its schools. *Id.* at 40, 44. Regarding gross negligence, she argues the evidence shows the District failed to exercise slight care even though Jane Doe's assaults were reasonably foreseeable to it. *Id.* at 48. As to the negligent hiring and supervision claims, Plaintiff appears to argue for the first time the District was negligent in supervision of its own employees, including Temoney (who she contends had a supervisory role over Bradley), Baker, and Shell. *Id.* at 49. Finally, Mother Doe agrees her claim for personal services is limited to medical expenses, past and future, and loss of services of Jane Doe, and agrees punitive damages are not recoverable under the SCTCA. *Id.* at 50.

In its Reply, the School District cites a recently decided Sixth Circuit case holding Title IX liability attaches only when a school has actual knowledge of actionable sexual harassment and its deliberate indifference results in further actionable sexual harassment. ECF No. 155 at 2 (citing *Kollaritsch v. Michigan State University Board of Trustees*, 944 F.3d 613 (6th Cir. 2019)). As Jane Doe was not subject to further sexual abuse after the School District had actual knowledge, it argues it cannot be liable under Title IX, even though Deputy Bradley remained at the school for the remainder of the year. *Id.* at 3-4. The School District argues it cannot be considered to have actual notice based on incidents involving third parties, and that even if it could, those previous reports did not provide the School District with actual notice of sexual abuse by Bradley. *Id.* at 5.

16

The District contends it did not have actual notice until April 2018, as the earlier report of the rumor is insufficient, and regardless it acted on the March 22, 2018 statement by calling Jane Doe's mother, encouraging Jane Doe to share more, and contacting Bradley's supervisor.  In addition, it argues Stacey Baker did not have the authority to fire employees and therefore was not an "appropriate official" under Fourth Circuit law.  *Id.* at 7.  In response to Plaintiff's negligent hiring, supervision, and retention claims having to do with Temoney, Baker, and/or Shell, the District argues there are no facts or evidence to support the District's knowledge of any unfitness of those actors.  *Id.* at 9.

## DISCUSSION

### I.    *Title IX – Fifth Cause of Action*

Title IX provides in pertinent part: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX is enforceable through a private right of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 684 (1979).  The Supreme Court has held a school district can be liable when a teacher sexually harasses a student, but "damages may not be recovered … unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 277 (1998).  The school district's liability is not vicarious, or based on *respondeat superior*, but instead is based on the district's own conduct in remaining idle after receiving actual notice of sexual harassment. *Id.* at 285.

17

The Supreme Court has held

> funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

*Davis Next Friend Lashonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  More recently, the Fourth Circuit has held, "[t]o establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). "A Title IX plaintiff completes her hostile environment showing at the summary judgment stage if, based on her proffered evidence, the sexual harassment can be said to deprive her of access to educational opportunities or benefits." *Id.* at 699 (internal citations omitted).   A plaintiff can be said to have been deprived of access to educational opportunities and benefits if the harassment (1) results in the physical exclusion of the victim from an educational program or activity; (2) so undermines and detracts from the victim's educational experience as to effectively deny her equal access to an institution's resources and opportunities, or (3) has a concrete, negative effect on the victim's ability to participate in an educational program or activity.  *Davis*, 526 U.S. at 650-61.

Liability may be imputed to an institution when "an official who ... has authority to address the alleged discrimination and to institute corrective measures ... has actual knowledge of

18

discrimination in the [institution's] programs and fails adequately to respond or displays deliberate indifference to discrimination." *Jennings*, 482 F.3d at 700 (internal citations omitted).

For purposes of summary judgment, the School District does not dispute that the first three elements of a Title IX violation are met.  Jane Doe is a student at an educational institution receiving federal funds: Spring Valley High School in Richland County School District Two.  She was allegedly subjected to harassment on the basis of her sex by Deputy Bradley, one of the SROs assigned to her school, who kissed, sexually groped, and/or sexually fondled her on at least five occasions.[13]  There is no dispute this alleged harassment, in the form of repeated sexual contact, was sufficiently severe or pervasive to create a hostile educational environment for Jane Doe.  However, the School District does contend District Personnel "lacked actual knowledge of Bradley's sexual harassment of Jane Doe," or, if actual knowledge is found, argues it did not act with deliberate indifference in addressing the alleged sexual harassment.  ECF No. 135-1 at 9, 12.  Finally, the School District argues there can be no liability where, as here, there was no further actionable sexual harassment.

a.  Actual Notice

Plaintiff's Title IX claim relies in part upon previous reports of inappropriate contact between Bradley and other female students.  However, Plaintiff has failed to set forth evidence sufficient to show the District had *actual* notice of prior sexual misconduct with other students, as

---

[13] These allegations are taken as true for the purposes of this motion.

19

required for Title IX liability. The reports of Bradley's alleged inappropriate relationships with female students prior to Jane Doe were insufficient to find actual knowledge imputable to the School District, as no victim or witness admitted *sexual contact* by Deputy Bradley until the current litigation; in fact, the students involved in the 2011 Cheerleader incident and the 2015 Target incident both denied sexual contact with Deputy Bradley when questioned by Sheriff's Department investigators and school officials. While reports of prior instances may be sufficient to establish constructive notice, actual notice is required under Title IX. *Gebser*, 524 U.S. at 285.

On the other hand, the School District had actual notice of at least some alleged sexual contact between Deputy Bradley and Jane Doe as of March 22, 2018, when Jane Doe told Assistant Principal Stacey Baker something on the scale between kissing and intercourse had occurred.[14] The District attempts to minimize this disclosure by arguing Jane Done only "indicated that at least kissing had taken place, again with no claims as to whether she was identifying Bradley or admitting it had happened." *Id.* at 11. However, a reasonable jury could find Jane Doe did admit to Stacey Baker Deputy Bradley kissed her (at least), as the entire conversation was concerning her relationship with Deputy Bradley and Ms. Baker testified Jane Doe eventually said "yes," that

---

[14] Actual notice has been found where a student or parent has made reports to a teacher and/or principal. *Vance v. Spencer Cty. Public Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) ("Both [student] and her mother made repeated reports to [the school district]. [Student] informed both her teachers and principals. . . ." Thus, [student] has satisfied her burden of establishing [school district's] actual knowledge.").

20

something on the scale between kissing and intercourse had occurred.  ECF No. 148-2 (notes of Stacey Baker); ECF No. 148-4 at 14 (Baker dep. at 106).[15]

Ms. Baker, also Spring Valley's Title IX coordinator, asked Jane Doe to "sleep on it and to tell me anything she thought I needed to know."  ECF No. 148-2 at 1.  Ms. Baker informed Principal Temoney of her conversation with Jane Doe, and called Mother Doe to inform her as well.  *Id.*  However, it does not appear anyone at the school spoke to Deputy Bradley at that point.  Instead, Principal Temoney informed Deputy Bradley's supervisor, Captain Ewing, of the pregnancy rumor, but Ewing recorded Temoney "believes it is possible that Jane Doe made up the rumor herself because she is attempting to go to another school and this may assist her in getting permission to switch schools."  ECF No. 148-7 at 1.  Temoney also reported to Ewing there were no red flags for Ewing to be aware of with Deputy Bradley.  *Id.*

Jane Doe next reported to Stacey Baker on April 9, 2018, a "hypothetical story" about a student named "Ashley" who had sexual contact with an SRO – the "married one with two kids."  ECF No. 148-2 at 2.  Although Jane Doe did not tell Ms. Baker the story was actually her own, Ms. Baker testified "the further into [the story] it went, I felt that she was referencing herself."  ECF No. 148-4 at 18 (Baker dep. at 139).  In addition, Ms. Baker was clear she believed the perpetrator in the "Ashley" story was Deputy Bradley, as "she said the married one with two children, and we only had two, and only one had two children.  So just the process of elimination."

---

[15] There is no doubt the School District had actual notice of Bradley's alleged sexual contact with Jane Doe on or about April 18, 2018, when Jane Doe reported five instances of sexual contact.

*Id.* Jane Doe detailed the sexual touching "Ashley" suffered, stating he pushed her on the table in his office, and there was touching and kissing around the neck and shoulder area and on the mouth. ECF No. 148-2 at 2. Ms. Baker confirmed Jane Doe had an unexcused absence for the time period in which Jane Doe said this occurred, lending support to the story and to the conclusion Jane Doe was the victim. She also briefed Principal Temoney, who notified other district personnel. *Id.* Ms. Baker's notes indicate she was told not to have Jane Doe write a statement at that time. *Id.*

Jane Doe's mental health provider, Susan Yelverton, contacted Ms. Baker on April 18, 2018, and informed her Jane Doe had told the "Ashley" story with more detail, describing being sexually touched on more than one occasion. *Id.* at 3. Ms. Yelverton also reported the statement to Captain Ewing,[16] who reached out to Ms. Baker for further information about Jane Doe, which she provided. *Id.* Ms. Baker also spoke to Mother Doe, who was upset about what Jane Doe told Ms. Yelverton and worried about her daughter. *Id.*

### b. Failure to Adequately Respond or Deliberate Indifference

Once the Sheriff's Department began its investigation of Jane Doe's allegations, the School District took no further action to investigate. As Traci Batchelder, District Title IX coordinator, testified, law enforcement investigations "don't absolve [the District] of that requirement" to thoroughly and promptly investigate a report of sexual harassment. ECF No. 148-12 at 11 (Batchelder dep. at 50); *see also* ECF No. 148-18 at 9 (C. Smith dep. at 35) ("Q: The question as

---

[16] After this report, the Sheriff's Department began a criminal investigation into Bradley's conduct, and Bradley was assigned to another school until the first week of May.

to whether or not somebody is guilty of criminal conduct and needs to be arrested is different than the question of whether or not somebody is fit to work in the educational environment, correct? A: That could be, yes."). Ms. Batchelder further explained about the Jane Doe report "that would likely be one that we would be told to stand down until the sheriff's department finished investigating . . . but yes, we would want to investigate it and get whatever information we could and what not." *Id.* at 22 (Batchelder dep. at 76). Instead, the School District relied wholly on the Sheriff's Department's investigation of Jane Doe's allegations, and took no action after its investigation was closed.

Although no sexual abuse of Jane Doe continued after the School District had actual notice of Jane Doe's allegations,[17] Deputy Bradley returned to Spring Valley in early May to finish the school year as an SRO.[18] Jane Doe was placed on homebound status. As noted in the School District's Reply memorandum, "[h]ad Jane Doe expressed an interest to return to school and school officials not provided a safe environment upon her return, an issue may exist, but that is not the

---

[17] The court notes, however, Deputy Bradley attempted to approach Jane Doe in the cafeteria one of the few days she was on campus after her initial disclosures to Ms. Baker. ECF No. 148-4 at 31 (Baker dep. at 191). Ms. Baker testified Jane Doe saw Bradley approaching and asked "[w]hy is he walking over here," moved partly behind Ms. Baker, and was "uncomfortable with that interaction." *Id.*

[18] Initially, the School District received a call from Captain Ewing advising Bradley would not be returning to Spring Valley on or around April 27, 2018. ECF Nos. 135-1 at 6; 135-8 at 19 (C. Smith dep. at 66). However, a few days later on or around April 30, 2018, the District was told he would be returning to the school, and he returned around the "first full week of May 2018." ECF No. 135-1 at 6; 135-8 at 19 (C. Smith dep. at 66).

23

case based on the evidence before this Court, and summary judgment is appropriate." ECF No. 155 at 4.

However, that is exactly the case, as evidenced by deposition testimony and documentary evidence before the court. Jane Doe testified at deposition she wished to return to school to finish the year, but did not because Deputy Bradley was present. ECF No. 155-5 at 16 (Jane Doe dep. at 31 ("Q: Did you want to go back to school that semester? A: I wanted to, but then I didn't want to because he was still there. But had he not been there, I would've wanted to go back . . . I would have liked to go back to school."). Jane Doe's mother in fact inquired of Ms. Baker whether Deputy Bradley could be reassigned so Jane Doe could return to school, but was told she had no authority to do this. ECF No. 135-19 (Mother Doe dep. at 110-111). Mother Doe believed it would not be beneficial for Jane Doe to return to Spring Valley while Deputy Bradley was there. *See id.* at 26 (Mother Doe dep. at 110) ("Q: You told me you told Ms. Baker that you felt it wasn't good for Jane Doe to come back to school if Bradley was going to be there and you asked if he could be removed, right? A: Yes."). Ms. Yelverton and Ms. Baker agreed, as Ms. Yelverton wrote to Ms. Baker in an email on May 8, 2018:

> Dr. Heath, our psychiatrist, would like to have a chance to talk to you and possibly Dr. Temoney about how to move forward with homebound for [Jane Doe] for the rest of the year . . . I heard from a woman from victim's assistance in RCSD at the end of last week who sounded as confused and frustrated as you did about SRO Bradley returning to Spring Valley . . . [Jane Doe] continues to feel that she would

> become suicidal if she returned to Spring Valley this year and SRO Bradley was there, which I completely understand.[19]

ECF No. 148-5 (Stacey Baker emails). Ms. Baker replied, stating:

> I know [Jane Doe] has to feel terribly confused and disappointed. It took a lot for her to finally tell us what was going on and then… nothing . . . She knows I believe her. . . . There are others here who believe her. That said, I understand 100% her hesitation about being back here. It's sad she is bearing the weight of all of this.

*Id.* Principal Temoney even acknowledged the "best thing is always to be in your school," but because Jane Doe's status on homebound was "working," there was no reason for Deputy Bradley to be reassigned at that point. ECF No. 155-3 at 4, 8-9 ("And it's her school; she has a right to be there. . . . So thinking back, if there was no homebound, the request probably would have been made, um, for the deputy to not – to be reassigned – I mean, to be reassigned.").

Deputy Bradley's presence, therefore, barred Jane Doe's "access to an educational opportunity or benefit," namely, being on campus for her high school experience and learning. *Davis*, 526 U.S. at 652; *Jennings*, 482 F.3d at 699 ("A Title IX plaintiff completes her hostile environment showing at the summary judgment stage if, based on her proffered evidence, the sexual harassment can be said to deprive her of access to educational opportunities or benefits.") (internal citations omitted). Therefore, the School District's actual notice of Jane Doe's allegations against Bradley was "followed by further discrimination, this time in the form of effectively

---

[19] These statements from Ms. Yelverton imply the decision to return Deputy Bradley to SRO duty at Spring Valley was made before the decision for Jane Doe to be placed on homebound status for the duration of the school year. In fact, by the time of this email, Bradley had already returned to Spring Valley.

denying [plaintiff] an opportunity to continue to attend [her school]." *Williams v. Bd. of Regents of Univ. System of Georgia*, 477 F.3d 1282, 1297 (11th Cir. 2007). In *Williams*, the plaintiff made the decision to withdraw from the university the day after she experienced student-on-student sexual assault. *Id.* at 1288, 1297. The Eleventh Circuit held her decision to withdraw was "reasonable and expected," as the university "failed to take any precautions that would prevent future attacks . . . Considering what had already occurred, UGA's failure was inexplicable and discriminatory." *Id.* at 1297. The Tenth Circuit came to the same conclusion in a case similar to the instant one, reasoning:

> Our final consideration under *Davis* is whether the school officials' deliberate indifference deprived [plaintiff] of access to the educational opportunities or benefits provided by [high school]. Again, we have little difficulty concluding that it did under the allegations set forth here. After the assaults, [plaintiff] became a danger to herself and had to leave school to be hospitalized. . . . [Plaintiff] is now home bound as a result of her experience at [high school]. The School District's deliberate indifference to her claims totally deprived [plaintiff] of its educational benefits.

*Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248-49 (10th Cir. 1999).

In this case, Jane Doe was deprived of the educational benefits of attending Spring Valley. She did not make the decision to withdraw, but remained on homebound status, despite a preference to return to Spring Valley for the remainder of the school year. She did this because Deputy Bradley was returned to his SRO position in the first week of May 2018. Accordingly, a rational jury could find the School District failed to adequately respond or was deliberately indifferent when Deputy Bradley was allowed to return to Spring Valley, which required Jane Doe to remain on homebound status for the remainder of the 2017-2018 school year.

26

The School District cites a recent Sixth Circuit case, *Kollaritsch*, in support of its argument that the Title IX claim fails because Jane Doe suffered no further sexual harassment after actual notice. ECF No. 155 at 2. The court in *Kollaritsch* defined injury as "the deprivation of access to the educational opportunities or benefits provided by the school." 944 F.3d at 622 (citing *Davis*, 526 U.S. at 650; *Vance*, 231 F.3d at 259). However, the court determined the causation requirement of *Davis* "requires a showing that the school's deliberate indifference subjected its students to harassment, necessarily meaning further harassment." The injury therefore, according to the court, must be "attributable to the post-actual-knowledge further harassment, which would not have happened but for the clear unreasonableness of the school's response." *Id.* The student-victims in that case remained on campus, and do not appear to have alleged they were deprived of any educational opportunities or benefits. Where, as here, a post actual notice deprivation of an educational benefit is alleged, such as inability to attend one's high school, a failure to allege further sexual harassment cannot defeat a Title IX claim.

In addition, there is a circuit split created by *Kollaritsch*, as the Tenth Circuit has expressly rejected an argument that a plaintiff must allege she suffered actual additional incidents of sexual harassment after actual notice. *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1104 (10th Cir. 2019). That court reasoned this argument was not "consistent with Title IX's objectives, which include protecting individual students against discriminatory practices," and that the alternative – that a student must be harassed or assaulted a second time before a school's clearly unreasonable response becomes actionable – would run counter to the goals of Title IX "and is not convincing." *Id.* (internal citations omitted). *Farmer* found the plaintiffs' allegations that "their fears have

27

forced them to take very specific actions that deprived them of the educational opportunities offered to other students" sufficient to plead the requirement that the funding recipient's deliberate indifference "caused them to be vulnerable to further harassment without requiring an allegation of subsequent actual sexual harassment." *Id.* at 1104-05. As cited above, the Fourth Circuit has also held the final requirement in Title IX is that the victim can be said to have been deprived of access to educational opportunities or benefits because of the harassment, and did not require further sexual harassment after actual notice. *Jennings*, 482 F.3d 699. Therefore, and because *Kollaritsch* is factually distinguishable, the court finds Plaintiff need not allege post actual notice further sexual harassment or contact.

c.   <u>Authority to address alleged discrimination and to institute corrective measures</u>

A defendant can be held liable for a Title IX violation only if "an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the defendant's programs and fails to adequately respond" or displays "deliberate indifference" to discrimination. *Gebser*, 524 U.S. at 290. While the School District argues its personnel did not have authority to fire Deputy Bradley, the MOA provided that if any problems with an SRO could not be resolved between the District and the Sheriff's Department, "the SRO *shall* be reassigned and a replacement SRO named in a timely fashion." ECF No. 111-1 at 10 (emphasis added). Principal Temoney had authority to request this reassignment under the MOA, and had actual notice of the allegations of sexual misconduct against

Bradley at the time.[20]   Therefore, it appears the District did have the authority to have Deputy Bradley removed from Spring Valley yet failed to do so.[21]   In fact, when the School District requested Bradley not return to Spring Valley in fall 2018, he was transferred.  A similar request to remove him from all District Two schools was also granted in December 2018.  ECF No. 148-28.

### d.   Conclusion as to Title IX Claim

There is a jury issue as to whether the School District failed to adequately respond or was deliberately indifferent when Deputy Bradley was allowed to return to Spring Valley (in May 2018) after the School District had actual notice of his alleged sexual harassment of Jane Doe, but Jane Doe was forced to complete the year as a homebound student or face her abuser.  Therefore, summary judgment is denied on Plaintiff's Title IX claim.

### II.   *Gross negligence – Fourth Cause of Action*

The court agrees, based on S.C. Code § 15-78-60(25), that Plaintiff's claim of negligence against the School District is subject to a gross negligence standard.  "The governmental entity is not liable for a loss resulting from: (25) responsibility or duty including but not limited to

---

[20] Assistant Principal Baker recommended to Principal Temoney that she "didn't think it made sense for [Bradley] to stay there."  ECF No. 148-4 at 8 (Baker dep. at 37).

[21] Principal Temoney testified he did not request Bradley be reassigned for the remainder of the 2017-2018 school year.  ECF No. 135-10 at 3-4 (Temoney dep. 51-52) ("Q: Did you ever request during your meetings with Mr. Smith and Captain Ewing that Deputy Bradley not return to Spring Valley to finish the 2018 school year? A: I did not.  Q: Why not? A: . . . two things: One, Jane Doe was kind of taken care of, you know, as far as classes.  Two, the investigation had occurred . . . so I'm assuming all of that was taken care of.").

supervision, protection, control, confinement, or custody of any student, . . . except when the responsibility or duty is exercised in a grossly negligent manner." § 15-78-60(25).   Under the SCTCA, a school district "may be liable to a student for a loss when the entity's responsibility to supervise, protect, or control a student is exercised in a grossly negligent manner."  *Woodell by Allen v. Marion Sch. Dist. One*, 414 S.E.2d 794, 795 (S.C. Ct. App. 1992) (citing S.C. Code Ann. § 15-78-6(25)).

In South Carolina, gross negligence is a "relative term, and means the absence of care that is necessary under the circumstances." *Hollins v. Richland Co. Sch. Dist. One.*, 427 S.E.2d 654, 656 (S.C. 1993).  It has also been defined as "the failure to exercise slight care," or "the intentional, conscious failure to do something which it is incumbent upon one to do, or the doing of a thing intentionally that one ought not to do." *Id.*  Gross negligence is ordinarily a mixed question of law and fact, but when the evidence supports only one reasonable inference, the question becomes a matter of law for the court.  *Clyburn v. Sumter Co. Sch. Dist. 17*, 451 S.E.2d 885, 887-88 (S.C. 1994).

The School District argues it is not liable for loss resulting from conduct of a third party other than an employee, unless the District created a reasonably foreseeable risk of third-party conduct.  ECF No. 135-1 at 23 (citing S.C. Code § 15-78-60(20)).  It also contends it was not grossly negligent because it "exercised at least slight care in supervising and protecting Jane Doe." ECF No. 135-1 at 28.   Finally, the District argues it is immune from suit under the SCTCA to the extent Plaintiff's alleged injuries resulted from the District's exercise of discretion or judgment under § 15-78-60(5).

30

a.  <u>Reasonably Foreseeable Risk</u>

The court finds § 15-78-60(20) does not provide immunity for the School District because the District cannot "successfully claim that the [plaintiff's] injuries were caused by the wrongful act of a third party when the basis of the claim was that the negligence of the [defendant] created a reasonably foreseeable risk of such third party conduct." *Moore by Moore v. Berkeley Cty. Sch. Dist.*, 486 S.E. 2d 9, 12 (S.C. Ct. App. 1997) (citing *Greenville Memorial Auditorium v. Martin*, 391 S.E.2d 546, 549 (S.C. 1990)).

By the time Jane Doe was sexually assaulted by Bradley in 2018, the School District had been made aware of four reports of improper conduct with female students from 2011 through 2016. Although the first incident, reported by the cheerleading coach at Richland Northeast, took place at a different school, the District-wide Title IX coordinator admitted the District was made aware of the report. ECF No. 148-12 at 8 (Batchelder dep. at 40). No School District investigation of any sort into Deputy Bradley's conduct was begun despite the cheerleading coach reporting statements by the student including "No offense Coach, but he is married to a white woman and no white woman can satisfy a black man the way a black woman can," that she and Bradley discussed how "it won't be long before she is eighteen," and that "the other officers know that he is mine." ECF No. 146-6 at 4.[22] Further, no record of this incident appears to have been made by

_____

[22] During the course of the Sheriff's Department's Internal Affairs investigation into this incident, it came to light that Bradley had previously been warned not to continue giving female students rides home in his patrol car, and had interfered with a dress code violation at Spring Valley by

31

the District.  Therefore, when subsequent reports were made, no District employee could determine this was a pattern by Bradley, despite acknowledgement by the then Spring Valley Title IX coordinator that the 2015 Target report would have been handled differently had the 2011 report been available.  ECF No. 148-13 at 5 (Shell dep. at 13).

In December 2015, Deputy Bradley was seen by narcotics agents with a female student behind a Target store at 10:30 pm.  Captain Ewing was notified that night, and the next morning he met with Principal Temoney and Assistant Principal April Shell at Spring Valley, and requested to meet with the student.[23]  Captain Ewing and Ms. Shell then met with the student, who acknowledged meeting Deputy Bradley but denied conversations of a sexual nature. The student then requested to meet with Ms. Shell after the meeting, and wanted to ensure Shell didn't "think less of her" because of all the questioning, as it was really "innocent."  ECF No. 148-13 at 7 (Shell dep. at 24).  Shell admitted at deposition the meeting between Bradley and the student was "surprising," and that if it had been a teacher with a female student, she would want that to be thoroughly investigated.  *Id.* at 6 (Shell dep. at 17).  She noted she was told the incident would be investigated by the Sheriff's Department and then learned it was resolved, but did not see any

---

telling a female student her dress was not too "short or sheer," in contradiction to an administrator's opinion.

[23] Shell testified at deposition she attempted to contact the student's parents before this meeting, but was unsuccessful.

results from the investigation. *Id.* at 7 (Shell dep. at 24). Emails on the District's server between Deputy Bradley and the Target student were in the District's possession but were not checked.[24]

Another report, from a Concerned Parent in late May 2016, was received directly by Principal Temoney and Assistant Superintendent Baron Davis. This parent reported Deputy Bradley was having a sexual relationship with a female student who was a friend of her daughter, and that she had heard previous reports about Bradley had been "covered up." The parent, however, did not return calls from Internal Affairs investigators and would not identify the student until after graduation the following week. The matter was never followed up on after the Sheriff's Department closed its investigation as unfounded.

The District argues none of these incidents would show Bradley's propensity to engage in sexual misconduct and therefore the School District "had no reason to predict that allowing Bradley to serve as an SRO in its school would lead to his sexually assaulting students in his office." ECF No. 135-1 at 27. However, Plaintiff has submitted evidence from which a jury could find the School District failed to exercise even slight care to protect its students from Deputy Bradley's sexual advances in light of previous reports of sexually inappropriate relationships with female students. *Moore*, 486 S.E.2d at 13 (citing *Doe v. Greenville Hospital System*, 448 S.E.2d 564 (S.C. Ct. App. 1994)) ("Under the facts of that case, we concluded the [defendant] knew or

---

[24] Although the School District argues it could not interfere with Sheriff's Department investigations by interviewing students, parents, or witnesses, there was nothing stopping it from seeking documentary evidence or continuing an investigation after the Sheriff's Department ceased pursuing the matter.

should have known of the necessity for controlling the [security guard] at the time of the alleged incident, because the [defendant] knew of another incident of inappropriate sexual behavior by the [security guard].").  Unlike *Moore*, in which the court found there was "no evidence . . .the District had notice of improper sexual conduct between [teacher] and any other students prior to the incident involving [plaintiff]" (*id.*), here there is evidence from which a rational jury could conclude School District employees had actual or constructive knowledge of a reasonably foreseeable risk to Jane Doe based on Deputy Bradley's previously reported, repeated conduct. By failing to exercise its duty and ability to investigate and document the previous reports, a jury could find the School District created an atmosphere of inattention and uninvolvement that gave rise to the risk that Deputy Bradley would continue his sexual misconduct with a student such as Jane Doe.[25]

In any event, the School District had actual notice of an allegation of sexual activity between Deputy Bradley and its student, Jane Doe, on March 18, 2018 when Jane Doe told Stacey Baker something "on the scale" between kissing and intercourse had occurred.  Certainly the District was on notice no later than April 18, 2018, when Jane Doe unequivocally reported five instances of sexual contact by Deputy Bradley.  Still, the District simply relied on the Sheriff's

---

[25] The School District argues it exercised at least slight care through an "adequate and proper supervision plan in place in the hallways, stairwells, bus loops, and other common areas of the school."  ECF No. 135-1 at 28.  This general supervision, however, does not suffice when the District has reasonable notice of a potential risk to female students from a particular individual who has an office on campus.

34

Department to investigate and failed to object when Deputy Bradley was returned to Spring Valley after the investigation was closed as unfounded.

The School District argues it relied on the Sheriff's Department's investigations of each incident, and that is sufficient to show it was not grossly negligent. The District cites *Etheredge* in support of its argument it exercised care, as the court in that case specifically found the District "had no direct knowledge or notice of the animosity between the attacker and victim," and therefore the "only reasonable inference" was that the School District exercised at least slight care to ensure its students' safety. ECF No. 135-1 at 27 (citing *Etheredge v. Richland Sch. Dist. One*, 534 S.E.2d 275, 277 (S.C. 2000)). However, *Etheredge* is clearly distinguishable, because the District in this case had actual or constructive notice of at least four prior reports of Bradley's alleged inappropriate conduct with female students, yet chose to take no action. The District simply took the Sheriff's Department at its word that the reports were unfounded.

This failure to act was in direct contravention of the School District's policies regarding reporting and response to allegations such as the ones in this case. Upon receipt of "any complaint or concern," the principal or contact person for Title IX, "in consultation with the District's Title IX coordinator," is to "initiate an investigation IMMEDIATELY, and certainly within NO LATER THAN three working days." ECF No. 148-6(emphasis in original). "Interim measures designed to protect the student, employee, or other designated individual from further harassment or inappropriate conduct MUST BE TAKEN IMMEDIATELY." *Id.* The District Policy on Prompt Corrective Action notes

> [o]nce a complaint is made, schools must take immediate and appropriate steps to investigate the incident and to end the harassment or inappropriate conduct of a sexual nature.  Prompt corrective action is the school's responsibility regardless of whether the victim who was subjected to the conduct files a formal complaint or otherwise notifies the school of the complaint.

ECF No. 148-10.  The School District Administrators' responsibilities policy provided that administrators "must take immediate corrective action when allegations of sexual harassment or inappropriate conduct of a sexual nature are reported, to stop the harassment and remedy any hostile environment that may have been created."  ECF No. 148-27.

However, it appears no School District employee followed these policies regarding any of the reports made to various employees about Deputy Bradley's inappropriate conduct with female students or even allegations of sexual contact.  After Jane Doe's report, Stacey Baker contacted Mother Doe, checked the security camera outside Deputy Bradley's office, and reviewed absences to determine if Jane Doe was out of class during the time periods reported.  The above actions by Ms. Baker were the only actions taken by any School District employee in response to Jane Doe's report, which according to District policies, should have triggered "prompt corrective action." Although the School District cannot be held liable merely for failing to follow policies, S.C. Code § 15-78-60(4), such a failure can be evidence of gross negligence.  *See Jinks v. Richland County,* 585 S.E.2d 281, 285 (S.C. 2003) (affirming denial of directed verdict when failure to monitor inmate was contrary to established policies, as record contained evidence of gross negligence); *Proctor v. Dept. of Health and Env. Control*, 628 S.E.2d 496, 510 (S.C. Ct. App. 2006).  Instead of initiating an investigation or taking other steps to protect its students, once the Sheriff's Department investigations into Bradley's conduct were closed, the School District took no further

36

action, and failed to request that Bradley not return to Spring Valley.  In fact, Deputy Bradley not only remained an SRO, but returned to Spring Valley before the end of the school year.

A jury could rationally find the School District's complete reliance on the Sheriff's Department's investigations into each report, including that of Jane Doe, as well as the failure to follow its own policies, constitutes gross negligence.  *See* ECF No. 148-3 at 4 (Temoney dep. at 52) (testifying, regarding the investigation into Jane Doe's report, "you have Richland County Sheriff's Department and Internal Affairs investigating," and I "was assuming that everything, you know, occurred as it should and, um, that part was address, you know, per – per the law . . . So I'm assuming all of that was taken care of."), *id.* at 11 (testifying regarding the Target student report, "I just knew that it was addressed.  I didn't have all the details . . . I didn't go into great detail about what happened; just that it was addressed from his supervisor and left it at that."), *id.* at 14-15 ("Q: And your district – your school never went out and got those details themselves, did they? A: No, sir.").  Despite conceding a criminal investigation may be looking for different information than one to determine whether an individual should remain in a school setting, the District took no action to determine whether Deputy Bradley should stay in its school, in spite of some members of the administration and the Sheriff's Department expressing concern with his remaining an SRO at Spring Valley. As a jury could find this response was grossly negligent, summary judgment on this cause of action is denied.[26]

---

[26] The School District has also argued it is immune from liability to the extent Jane Doe's injuries resulted from the District's exercise of discretion or judgment.  ECF No. 135-1 at 30.  However,

III.    *Negligent hiring, supervising, and retaining – Sixth Cause of Action*

Under South Carolina law,

> [a]n employer may be liable for negligent supervision when (1) his employee intentionally harms another when he is on the employer's premises, is on premises he is privileged to enter only as employee, or is using the employer's chattel; (2) the employer knows or has reason to know he has the ability to control the employee; and (3) the employer knows or has reason to know of the necessity and opportunity to exercise such control.

*Doe v. Bishop of Charleston*, 754 S.E.2d 494, 500 (S.C. 2014) (*citing Degenhart v. Knights of Columbus*, 420 S.E.2d 495, 496 (S.C. 1992)). South Carolina also recognizes the tort of negligent retention, and the cases "generally turn on two fundamental elements – knowledge of the employer and foreseeability of harm to third parties." *Doe v. ATC, Inc.*, 624 S.E.2d 447, 450 (S.C. Ct. App. 2005). The court agrees the School District was not Deputy Bradley's employer, and therefore cannot be held liable for negligence in hiring, supervising, and/or retention of Deputy Bradley. *See Callum v. CVS Health Corp.*, 137 F. Sup. 3d 817, 861 (D.S.C. 2015). In fact, Plaintiff seems to abandon this claim as to Deputy Bradley, arguing in response to summary judgment only that "Richland District Two was negligent in its hiring and supervision of its own employees," "including Jeff Temoney, Stacey Baker, and April Shell." ECF No. 148 at 49. However, Plaintiff then only sets forth argument as to Principal Temoney, noting the performance evaluations

---

"discretionary immunity is an affirmative defense" under South Carolina law, and would require the School District to prove its employees evaluated competing alternatives and made a judgment call based on applicable professional standards. *Stephens v. CSX Transp., Inc.*, 781 S.E.2d 534, 543-44 (S.C. 2015); *Foster v. South Carolina Dep't of Highways & Pub. Transp.*, 306 S.C. 519, 413 S.E.2d 31 (1992). This the School District has not done; therefore, it is not entitled to immunity under this provision of the SCTCA.

38

praising Bradley and Temoney's failure to "intervene to prevent [Bradley's] sexual assault upon Temoney's students." *Id.* These cursory and conclusory arguments are insufficient to survive summary judgment when there are no specific allegations in the Complaint regarding these District employees. Accordingly, summary judgment is granted as to the Sixth Cause of Action and it is dismissed with prejudice as to the School District.

## CONCLUSION

For the reasons above, the court concludes as follows: (1) the School District's motion is denied as to the Title IX claim (Fifth Cause of Action) for the time period when Deputy Bradley returned to Spring Valley in May 2018 through the end of the 2017-2018 school year; (2) the motion for summary judgment as to the Fourth Cause of Action is denied; (3) the motion for summary judgment as to the Sixth Cause of Action is granted; (4) the Seventh and Eighth Causes of Action are dismissed with prejudice by consent. The following claims are for trial as to the School District: (1) Fourth Cause of Action; (2) Fifth Cause of Action for the period after Bradley's return in May 2018; (3) Ninth Cause of Action.

Jury Selection is scheduled for July 30, 2020, and the trial will begin August 10, 2020.

**IT IS SO ORDERED**.

s/Cameron McGowan Currie<br>CAMERON MCGOWAN CURRIE<br>Senior United States District Judge

Columbia, South Carolina
March 19, 2020

39